**UNITED STATES of America, Plaintiff,**

**v.**

**Benjamin Barry KRAMER, Jack Kramer, Melvin Kessler and Michael Gilbert, Defendants.**

**No. 87–879–CR.**

United States District Court, S.D. Florida.

July 22, 1991.

---

Robert Bondi, Asst. U.S. Atty., for United States.

Lawrence Rosen, Albert J. Krieger, Miami, FL, Mary Catherine Bonner, Ft. Lauderdale, FL, for Benjamin Kramer.

Michael S. Pasano, Miami, FL, for Michael Gilbert.

E. David Rosen, Miami, FL, for Jack Kramer.

Arthur W. Tifford, Miami, FL, for Melvin Kessler.

## AMENDED FINAL ORDER WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROETTGER, Chief Judge.

An essence of money laundering is deceit and cover-up. This case abounds with examples of "dragging dead fish across the trail" to throw bloodhounds off the scent or "dragging branches behind a horse to destroy the tracks on the trail."

Anyone who sat through the three month long criminal RICO trial had no doubt it was a clear case of money laundering of drug smuggling profits and it was demonstrated and proved not only to the satisfaction of the jury, but, the court believes, to the satisfaction of anyone at the trial.

The evidence in the two-plus month long ancillary hearing under 18 U.S.C. § 1963, corroborates the illegal money laundering activity even more. The case is "document-intensive" with approximately 1,200 exhibits.

### STATUS OF THE CASE

Following the jury verdict of guilty on the RICO counts as to all four defendants, (Sam Gilbert had also been indicted originally but died shortly thereafter) a preliminary hearing was held and an order entered freezing the assets of the Bicycle Club, based on the jury verdict forfeiting the interests of Ben Kramer, Jack Kramer and Michael Gilbert in the Bicycle Club.

Only the interests of these three convicted defendants in the Bicycle Club were forfeited. The jury determined that Mel Kessler had no interest in the Bicycle Club and declined, therefore, to enter a verdict of forfeiture as to Defendant Mel Kessler.

Immediately a number of claimants filed their petitions under 18 U.S.C. § 1963(1)(2). This was no surprise: Attorneys for a corps of claimants were present throughout nearly all the criminal proceedings. Basically, those claimants fall into two groups. One group had persons with an interest in Park Place Associates while the second group comprised those persons with a claim by virtue of a California general partnership known as LCP. This order will basically ignore the Park Place Associates group because the government quickly relinquished any opposition to its claim because of its non-involvement in money laundering.

LCP stands for Lyon, Coyne and Pierson. Claimants are as follows: Dale Lyon, Maureen Lyon, his wife, and the Lyon Family Trust; Julieann Coyne, now married and known as Julieann Coyne Wasson, and her husband, Christopher Wasson; David Pierson and Lois Pierson, his estranged or divorced wife; Karen Gilbert, Michael Gilbert's wife, and the Michael Gilbert Family Trust; Robert Gilbert and Margaret Gilbert, siblings of Michael Gilbert, and the Robert Gilbert Family Trust.

Although § 1963 is silent as to depositions, the court permitted the parties to take depositions during the summer before the hearing.

The ancillary hearing began the second Monday in September and throughout the proceedings in September the parties requested recesses and wanted time so they could pursue settlement negotiations. Although different degrees of optimism were expressed from hour-to-hour and from day-to-day, it still seemed like a hopeful possibility. Finally, towards the end of September, the parties requested that the court recess the case to permit lengthy and intensive settlement negotiations; the parties were to advise the court on November 30, 1990 whether they had settled their claims, with all parties understanding that if they had not settled, the ancillary hearing would resume on Monday, December 10, 1990.

All of the claimants settled except Dale Lyon, the Lyon Family Trust, Karen Gilbert, and the Michael Gilbert Family Trust. The other claimants are not involved in these proceedings. The claimants requested at the beginning of the ancillary hearing, on December 10, 1990, that the court not be advised of the details of the settlement negotiations for fear it might cause some influence, even subconsciously, on the court's evaluation of the evidence. Consequently, by stipulation of the parties, the settlement agreements for the claimants who had settled and the government were dictated into the record outside the court's presence; the court is still not aware of the details of the various settlements.

## EVIDENCE OF MONEY LAUNDERING OF DRUG SMUGGLING MONEY

It is difficult to compress three months of trial evidence without omitting important details. Ben Kramer, when released from his prison term for smuggling marijuana in the late 1970s, resumed smuggling but began the smuggling operations on a grand scale. Ben had partners: Randy Lanier and Tommy, known as George Brock, and Gene Fisher. Gene Fisher and Tom were paired together in their interests in this operation and the pair's total interest was equal to the individual interests of Ben and Randy. Ben's modus operandi was to think big and not import marijuana in Lockheed Lodestars or shrimp boats or sailboats as had been the general practice in this area.[1] Ben Kramer's modus operandi was to use barges or freighters and even to containerize the marijuana, so that it could be quickly offloaded at the port of entry and warehoused and then distributed. The audacity of this operation was quite successful: He imported a barge full of

---

1. I think I can speak with some expertise in this area, as I believe I have tried more narcotics cases than any active or senior U.S. District judge in America at this point, but only because of Chief Judge King's reduced caseload in the last six and a half years.

marijuana into the old Brooklyn Navy Yard, San Francisco, and into New Orleans.

An insight into how successful the operation was can be illustrated simply by looking at the single New Orleans operation. The combine netted $41,000,000. and Ben's one-third share was $13,000,000. The small fry apparently divided up the remaining $2,000,000.

Ben Kramer is colorful with his share of audacity and boldness; he was the National Offshore Powerboat Racing Champion in 1986 and raced in many races, including a $50,000. ante, winner-take-all offshore powerboat race from Miami to New York. He was building a boat for a race from New York City to London.

Ben was injured seriously prior to the criminal trial when he tried to escape via a helicopter from Metropolitan Correctional Center (M.C.C.) near Miami. Like a movie scene, Ben grabbed a rope ladder dangling from the helicopter as it hovered over the prison courtyard. Unfortunately for Ben, the helicopter began moving forward before it gained sufficient altitude for Ben to clear M.C.C.'s perimeter fence.

Another illustration of the type of operation it was came before the jury in the testimony given by Podesta, whose job was to bring the cash gathered by the marijuana distributors to Ben Kramer. Members of the jury had stunned looks on their faces when Podesta testified about showing up somewhat unexpectedly at Ben Kramer's house with $7,000,000 in cash and Ben told him he was not ready to receive that much; Ben asked Podesta to take it back to the house where Podesta was staying and to bring it back in "small amounts." Podesta testified he took it back and kept it in the garage overnight; then he began, in his description, to deliver it to Ben "in small amounts—such as $2,000,000, $3,000,000" and so forth.

The volume of cash generated a problem in the Kramer combine. It was too much money in cash and they needed to find a way to launder it. Along the line Ben's father, Jack Kramer, had met Sam Gilbert in 1978 when Ben had a spare $80,000. and was looking for a good investment. Mr. Zuckerman in Los Angeles, who is not involved in this matter, introduced Jack Kramer to Sam Gilbert. The $80,000. was in cash, or had been deposited as cash.

So Jack Kramer's contact with Sam Gilbert was re-established with an idea of finding a way to launder Ben's money.

Meanwhile, out on the West Coast in the beginning of 1978, there had been a discussion even then between Jack Kramer and Sam about a card club called the Commerce Club. Jack Kramer's description of it was a "red herring."

Card clubs or casino card clubs were in existence in the Los Angeles area, although some had less than phenomenal success and one was in receivership. George Hardie in 1982 got a license for the Bell Gardens Bicycle Club from the City of Bell Gardens. Finding a site was a problem. The site finally selected had 70 houses on it. A development grant was obtained as part of the funding of the City. Relocation of all the occupants of the land took awhile. Meanwhile, in August of 1983, Sam Gilbert and David Pierson's discussions about a casino card club had proceeded to the point where they needed money to build the card club, and they had been talking with George Hardie, as well. Hardie had raised some money (roughly $400,000) in a limited partnership known as Park Place Associates. They had been unable to come up with the money needed to buy the land, build the building and get started.

## CONVERSION OF CASH TO CASHIER'S CHECK

The money laundering, that is the conversion of cash into cashiers checks, was accomplished in California by various methods.

The cash was taken to California in several ways by couriers. One colorful example involved carrying cash in the biggest Igloo ice chest sold in a private jet to a private airport, then carrying it to the Beverly Hills Hotel and up to a private suite. If someone asked, the ruse was to claim

the ice chest carried the remains of a faithful dog—on ice, to be sure.

The main method seemed to be conversion of cash into gold coins, at that point in time mostly krugerrands, and then sold back to coin dealers (numismatics dealers) for checks to be converted into cashiers checks.

Laundering money is not cheap and the cost of laundering this money through the coin dealers and other operations cost nearly $980,000. The checks from the proceeds of the sale of the coins back to the dealers were then converted into cashiers checks and sent to the Liechtenstein trust formed for this money laundering venture.

The matters were proceeding on two tracks: an East Coast track and a West Coast track.

In September of 1983, Ben and Jack Kramer met with George Brock (Tom), at the Hotel Pierre in New York City, where they discussed the money laundering operation. In October, 1983, Lyon and Coyne are brought into LCP by Sam Gilbert. Ostensibly, Sam Gilbert released his 60% of LCP to them for little or no consideration— at least that's the way it appears from the evidence albeit most strangely out of character for Sam, considering every description that came out about Sam Gilbert in the five-plus months of trial and ancillary hearing. Coyne testified her 30% cost $1,000., but did not indicate to whom it was paid.

Pierson was told by Sam that all he wanted was to build the building with his construction company and to get the operation going and they would need someone with the banking and business experience of Dale Lyon and the personnel background of Julieann Coyne.

Whether the fact that Sam Gilbert and Julie Coyne had a romantic relationship for several years had anything to do with it is, of course, speculative. In any event, that relationship had broken off about a year earlier and, presumably, it had nothing to do with it as that was the month she became married.

On October 21, 1983, the court finds there was another meeting at the Pierre.

At that meeting were Dale Lyon, Mel Kessler, Ben Kramer and Sam Gilbert. There was a discussion about the Bell Gardens Bicycle Club.

In October, 1983, CGL was a holding corporation in California whose principals were Julie Coyne, Sam Gilbert and Dale Lyon. Dale Lyon was the President. Julie Coyne was the Chief Financial Officer, but Sam Gilbert ran the show even though he had only 20% of the stock. The remainder was split between Coyne and Lyon. Coyne paid $3,000 for her interest.

There was a meeting at L'Ermitage Hotel in Beverly Hills on November 17, 1983. Jack Kramer met with Sam Gilbert about the laundering scheme. Government agents there had the building under surveillance, but not apparently as to this venture.

In any event, on a piece of yellow tablet paper Sam Gilbert scrawled a number of things. (Govt. Exhibit 183); the exhibit was recovered by the agents from the trash.

On the upper left-hand corner it says Capital L period, account abbreviated. Underneath it Liechtenstein, spelled incorrectly as Lichtenstein. To the right of that in the upper right-hand corner it says NV Corp. Under that Tortola. Then a line from Tortola to a line that says Investment Trust. The next line says Employee: Dale Lyon. A line is skipped and then there is another sub-topic for Owner Group. Listed under the owners group, Hardie, misspelled, Dale Lyon, underlined, also misspelled as Lyons rather than Lyon; David Pierson and lastly, Julie. Those are the four principals in LCP and Park Place Associates; at that time they were the general partners in the two groups, but not overlapping general partners.

The meeting was fairly short on the evening of the 17th. Jack Kramer revealed the contents of the conversation to be a discussion between him and Sam as to the money flow, which is reflected on Government's Exhibit 182. The next morning Sam prepared the chart (Govt. Ex. 183) and, referring to Hardie, Lyon, Pierson and Coyne, said: "these are your straw people.

These are lily-white people who will be approved by the Gambling Commission." These are "the names."

Then Sam Gilbert and Jack Kramer went to breakfast at the Bel Air Hotel or motel. Sam made it explicit to Dale Lyon that payments were to be made to CGL even before the light bill was paid. Jack Kramer noticed that Dale Lyon never questioned why he, Lyon, was there or why Jack Kramer was there. That is the first time Jack Kramer met Dale Lyon. Jack Kramer noticed that Dale Lyon's cuffs were frayed.

Then Jack Kramer and Sam Gilbert flew to Liechtenstein for a meeting with Dr. Biedermann. That is when the BTR Trust was created for Ben, Tom, and Randy Lanier and the intervening trust known as Cortrust.

The first Trident Center meeting in Los Angeles of the group occurred in November of 1983. That meeting had Mel Kessler present with Jack Kramer; also there were Sam Gilbert, Michael Gilbert, Dale Lyon and, briefly, David Pierson wearing a white suit. Mel Kessler's memory of that attire, so obvious to anyone watching him testify, was too strong to doubt its credibility. David Pierson testified he had not bought a white suit in ten years, but that's not a denial of having worn it. The court finds Pierson was there, arrived with Ben and left with Ben.

On November 29, 1983, Dale Lyon flew to Florida for a meeting with the Kramers and he stayed at a Holiday Inn. Documentary evidence of this and the October trip to New York is Government's exhibit F–31. That was the last time in his many trips to Florida that Lyon stayed in a Holiday Inn; thereafter, he stayed at far more prestigious Turnberry Isle.

On December 5, 1983, all documents are executed. Clearly, Fainsbert was a busy lawyer between the first Trident meeting and the execution of all documents on December 5, 1983 for the LCP partnership and joint venture agreement as well as the CGL loan agreements. Those documents, at least, were executed on December 5th.

Some of the prior findings, especially as to the meetings came out in testimony of the co-defendants, Jack Kramer and Mel Kessler at the end of the ancillary hearing. Further findings on this evidence and other meetings are contained subsequently.

Let us venture down to Tortola. Tortola is part of the British Virgin Islands, whose capitol is Roadtown. There Shaun Murphy was busy as an accountant operating as a trustee of various offshore trusts. He had a number of shell corporations. In other words, corporations that had been formed, but they were mere shells that really did not do anything. Nevertheless, they had the benefit of having some age on them with nothing that they had done wrong. He utilized Troon, and Troon BV, one Dutch and one a Netherlands Antilles Corp. and the benefit of working through Troon is that there are only two countries in the world that have a treaty that avoids a 20% withholding tax for American citizens who are recipients of money. Tortola is one of them.

Mel Kessler knew all about that from practicing criminal law in South Florida, plus Mel kept a boat docked at Tortola; So Mel, being well aware of the need for the money laundering and the offshore entity to accomplish it, arranged for Shaun Murphy to use Troon to carry out the purposes of the money laundering operation. The money flowed for the first time from Liechtenstein to Troon on January 29, 1984. The construction on the Bell Gardens Bicycle Club began in January of 1984. The construction was to be performed by the Sam Gilbert Construction Company on a 10% profit basis.

Included among the December 5th documents in evidence was also the guarantee from Sam Gilbert to the re-development agency of the City of Bell Gardens in the amount of $1,000,000. Other documents include the remaining unpaid purchase price for the site (1A) following payment of the $1,000,000. deposit and signed by Sam Gilbert. There also was a site agreement (39B) between Troon Mortgage and CGL Investment Company and a loan agreement of Troon and CGL where Troon agreed to lend up to $15,000,000. Of course, there is another loan agreement between Troon and

CGL where Troon agreed to lend up to $20,000,000. A note (Ex. 538)) was signed by Park Place Associates and LCP Associates through their general partners in the amount of $15,000,000. Also, there was a loan agreement referring to a memorandum of loan agreement on November 22, 1983 wherein CGL received ½ of 1% of all payments made to Troon as a management fee; additionally, Dale Lyon and Sam Gilbert personally guaranteed the payment of the loan made by Troon to CGL. For purposes of the record the memorandum of loan agreement was Government's Exhibit #535 between Troon Mortgage Investments and CGL Investments executed by Shaun Murphy and Dale Lyon bearing date of November 22, 1983 although the court doubts it was signed by both of them on November 22, 1983.

On the 6th of December, 1983, Dale Lyon signed two form notes marked "note-straight." The first note, government exhibit 544, was executed by the Bicycle Club to CGL Investments for $1,663,000. at the rate of 15% per annum payable March 6, 1984 and monthly thereafter. The second note, government exhibit 543, was executed by CGL to Troon Mortgage Investments, N.V. and contained the same amount, terms and conditions as the first note.

TESTIMONY OF LCP PARTNERS

MICHAEL GILBERT

Beginning first with the testimony of Michael Gilbert, he testified that Dale Lyon was an active, not a passive, general partner of LCP, while both Michael Gilbert and his brother, Robert Gilbert were working for the Sam Gilbert Construction Company, SGA Associates, the contractors who were building the Bicycle Club. He testified that the Club's profit level was improved by court cases, which permitted a larger scope of games to be played, thereby broadening the customer base.

The construction costs necessary to finish the Bell Gardens Bicycle Club far exceeded anyone's estimations. In fact, it was a cost overrun of almost 100%. The Bell Garden Bicycle Club received the amount of $12.6 million from Troon, but because of the cost overrun it actually cost $22 million to build; therefore, before the group could begin operation, the group had to obtain funds from a number of other financial sources.

In November of 1984, Sam Gilbert told Michael Gilbert a 20% portion of LCP was available for purchase for $200,000. Michael discussed it with his siblings and they decided to borrow $200,000. from Olympic National Bank. Michael called the loan officer and got the bank's approval, the bank indicating there was no problem. Michael Gilbert, Margaret Gilbert and Robert issued checks to LCP and the loan proceeds were distributed to them. Robert Gilbert received 10%, of which he designated one-third for the Robert Gilbert Family Trust; Margaret Gilbert received only .8325% with the balance of the remaining 10% allocated to Michael Gilbert. He allocated 2.497% to the Michael Gilbert Family Trust.

Michael Gilbert's check to LCP covered also the Michael Gilbert Family Trust, according to Michael's testimony. Robert did the same covering the Robert Gilbert Family Trust. However, Michael Gilbert wrote one check for $66,666.67 and Fainsbert as co-trustee of the Michael Gilbert Family Trust wrote another one on the following day. LCP was to pay the loan and the interest until LCP was profitable and then pay it out of the Gilberts' distribution.

Once, Michael Gilbert apparently forgot and made an interest payment to Olympic National Bank which sent the check back to him. The letter of transmittal to Michael Gilbert (Government's exhibit #18) indicated that the money had already been credited to the loan and the bank returned his check. The check was dated July 9, 1985.

The parties in this case did not object to the testimony of Sam Gilbert coming into evidence and all sides utilized that opportunity freely.

As to the Olympic Bank loan to the Gilberts, it is interesting that, after a year and-a-half of little repayment of principal, the $147,500 balance of the loan or nearly 75% of the total Gilbert siblings' loan was

paid off in the next payment following the arrest of Shaun Murphy in Tortola in April of 1986.

## DAVID PIERSON

David Pierson had worked with both Julie Coyne and Dale Lyon. Pierson started the Olympic National Bank. Coyne and Lyon had worked together in Imperial Bank where Coyne was the Personnel Director with 700 or 800 employees. Lyon had been the Administrative Vice President at Imperial.

On the joint club venture, 70% was to be LCP's share and 30% to PPA until the CGL loan was paid off, then the figures were to be 60% to LCP and 40% to PPA; there was a further provision that at any time the profits reached six million dollars, then the split was to be 65/35. That limit was hit and it has been 65%/35% for some years. Pierson claimed that what was in the Bicycle Club for Sam Gilbert was that Sam kept his crew busy. Sam had a 10% fixed fee contract.

Pierson observed that Sam was active in the construction phase and after the Club was open until the CGL loan was paid and then he no longer came around the Club.

On cross-examination, David Pierson denied that the real reason Sam Gilbert stopped coming to the Bicycle Club beginning in January, 1987 was the onset of Sam's medical problems. The only finding the court can make is that Sam was extremely active in the operation of the Bicycle Club until the CGL loan was paid off. Sam was making sure no one would err by linking the Kramers to the ownership or operation of the Bicycle Club and it was this occurrence, not ill health, that caused him to stop his active participation.

The Bicycle Club joined with other California clubs in litigation to win authorization of the Asian games and the case was finally won in June of 1987. Pierson described the Bicycle Club in this way: that the largest card room in Las Vegas has 50 tables and the Bicycle Club has 160 and needs more, with 8 players at a table. The club has 7 acres of parking, which holds 2000 cars which, for comparison, amounts to ⅐ of the number of parking places for Joe Robbie Stadium in Miami. The court takes notice that Joe Robbie Stadium holds 73,000 people.

When the Gilberts wanted to obtain 20%, there was a discussion among the partners of LCP. Pierson gave up 10% to admit the Gilberts and eventually Coyne did likewise on the basis that the club needed more money and needed to guarantee the Sanwa loan. Pierson felt that $200,000 was a fair price inasmuch as one of the conditions of letting the Gilberts in was a guarantee of the Sanwa loan by the Gilbert interests. Sanwa Bank got the guarantee of Michael, Robert and Margaret Gilbert rather than Sam's guarantee. Julie Coyne observed that she would rather have 20% of a club that was open than 30% of a club that could not open.

Pierson said he was not at Michael Gilbert's for a meeting between May and December of 1983, but was at a meeting with the Kramers, Ben and Jack, the Gilberts, Sam and Michael, and Mel Kessler in December of 1983 and that Karen Gilbert came in and out of the meeting.

Pierson, after first lauding Lyon's work at the Bicycle Club, said it was Hardie's idea to put a dealer at every table; when the club first had an outside audit, there were substantial adjustments to be made and that was Lyon's realm of responsibility.

In April of 1986, not coincidentally the court finds, with the arrest of Shaun Murphy in Tortola by Scotland Yard, Sam wanted Pierson to make a "loan" from LCP to Jack Kramer of $500,000. and Sam assured Pierson that Julie and Dale had agreed to it so Pierson made the "loan" to Jack Kramer without checking with anybody else; the "note" was also unsecured. Later it turned out Dale Lyon didn't know, nor had Julie Coyne and Dale Lyon approved. The court makes this specific finding: the reason Lyon did not approve was not that he was worried about the $500,000., but he didn't want any links emerging between Jack Kramer and the Bicycle Club—particularly since Shaun Murphy had been arrested and Dale Lyon knew that.

The $500,000. "loan" did not go into default until May of 1987; not surprisingly, no legal action has been taken to try to recover that from Jack Kramer.

In June of 1986, although there is some question about whether it is a time deposit, a certificate of deposit, or a money market account, $200,000. belonging to the Bell Gardens Bicycle Club was pledged to the Safra Bank for a "loan" to Jack Kramer. Pierson said he was at Sam's office a block or so away from Olympic National Bank and Sam asked him to do that. Pierson did not know of the existence of this $200,000. time deposit or MMA until Sam asked him to deposit a $200,000. time deposit in Safra Bank in California for a loan to Jack Kramer by a Safra branch in Miami. Two weeks later, Pierson called Dale Lyon to tell him about it because Pierson was troubled by it; Pierson felt he had strained the interpretation of the agreement to give himself the authority. He never called Julie Coyne or George Hardie.

Pierson testified that the first payment on the $500,000. was due in May of 1987, but that before then, Agent Edwards and Agent Borah had come to see him in November, 1986 asking about Jack Kramer and the Gilberts and the Bicycle Club; he testified he did not talk with Sam about the $500,000. loan after the agents left. As a result of the conversation with Dale in July or August of 1986, Pierson knew that there were problems with Jack Kramer. He also said that Dale was upset when he heard about the $200,000. time deposit so Pierson did not call Sam. Again, it's not surprising that Dale was upset: he knew of the details of the Kramers' involvement.

Pierson testified he felt he was making the $500,000. more available to Sam. Pierson tried to explain that he had 30% of the money and, if his action was improper, he could afford to risk $150,000. He did not explain about the fact he was risking $150,000. of Lyon's money or $100,000. of both the Gilberts' interests and Julie Coyne's money. Part of this may be because Pierson felt beholden to Sam. Pierson had borrowed $500,000. from Sam in 1984, giving a mortgage on his house and then borrowed $350,000. from Sam in 1985, giving a UCC Lien on his interest in the Bicycle Club; therefore, a year later when Sam asked for $500,000. for Kramer, Pierson said he didn't think it was appropriate to ask for collateral.

As to why Sam gave up his 60% interest and did not want any title or ownership in the Bicycle Club, Sam asserted to Pierson he did not want any of the risks. It's hard to square that with the guarantee Sam signed on December 5, 1983. Sam had told him "I am out of it, I don't want the risks" and Sam told Pierson it would be unprofitable; Julie Coyne similarly testified that Sam did not want to be a partner in LCP for many reasons, among which was because he felt the business was risky although they would make money.

Sam further indicated to her that the business was not compatible with his reputation in the LA area and that he did not want to be any partner except a general partner.

## JULIE COYNE

Julianne Coyne is a bright, talented, tough, very attractive lady. Her timing was pretty good. She started off with the Bank of America, then the Crocker Bank and in September of 1976, she interviewed with Imperial Bank as Director of Personnel and Dale Lyon was there as Administrative or Executive Vice President. The bank had only 200 employees but had grown to 800 employees when she left in February of 1980 and she had done various things, including affirmative action plans and so forth. She described Lyon as the third or fourth most responsible person in the bank. She became a personnel consultant for smaller banks for headhunting and to work on affirmative action programs, compensation programs, personnel programs and with their training programs, etc., and was grossing $250,000. to $400,000. a year.

She met Sam Gilbert in 1977 and from April, 1978 to mid–1982 she and Sam Gilbert were lovers. She spent a considerable amount of time with him which translated to five or six days a week with trips to Europe and elsewhere overseas. She de-

scribed him in various ways during her testimony: e.g., one strong personality, that he was inventive because they had a business together (Fivel) developing shock absorbing athletic shoes, and he dabbled with ideas for magnetic door closers, curtain rods, etc. When she was in Fivel Corporation jointly with Sam, she put no money into it. It all came from Sam. Sam never told her he was a money launderer. After the relationship was over, she and Sam remained friends but mostly it was a business relationship.

She hired Pierson's law firm to represent Imperial Bank in affirmative action matters. She knew Pierson in the early 80s because she hired their key executives. She first became aware of the Bicycle Club venture in a call from Pierson to get prospects. She took the idea to Sam on the basis he might want to build a casino and invest in it, and Sam's response was that building it is fine, but he didn't know about investing in it. He suggested she take it to a banker and get it evaluated.

So Julie suggested Lyon and Sam agreed. They had used Lyon before in the shoe business, Fivel. Sam was interested.

Subsequently, after discussion about the Bicycle Club early on, she buttonholed Sam and said that Dale and David have a piece of this Bicycle Club business and you have the construction contract. She felt she needed a finder's fee.

Sam responded: "you do, but it's a start-up business and it can't afford it. Why not take a percentage?" She didn't like the risk of it, and was a bit anxious about that, but she agreed to do that. She paid $1,000. for her thirty percent.

Because she decided it was time in her life to get married and start a family, Julie broke off the romantic relationship in 1982 and Sam was furious. In 1979 or 1980, she had bought a condo worth $110,000. and Sam had given her $50,000. to put down on it. She made the payments on the remaining balance of $60,000. but when they broke up, Sam insisted on her giving him a quitclaim deed to the condo. She also expressed very strong feelings against Sam. There was an exclamation later on during her testimony: she "would never forgive him for getting her into all this!" She went no further with that nor were there any questions about it.

Sam told her he did go to the New York Teachers Credit Union because he had gotten credit from them before. Sam advised her he had arranged financing for the Bicycle Club. She was relieved because that was LCP's job for Bicycle Club venture.

In November, 1983, the name Troon Mortgage came up. Sam said he was unable to get the New York Teachers Credit Union loan, so he arranged it through Troon Mortgage, and that it was an offshore trust. She was not concerned because Sam had guaranteed it and he wouldn't have done that if he didn't think it was a good loan and one that could be paid back.

She identified the handwriting on Exhibit 183, the note picked up at the L'Ermitage, as definitely being Sam's on the top half and the numbers on the bottom half appeared to be Sam Gilbert's. She couldn't say as to the printing on Exhibit 182, as to money flow.

As to CGL, Sam did not want David Pierson in CGL as Pierson was involved in two start-up businesses, Olympic Bank and the Bicycle Club. Sam acted as both president of CGL, Lyon's title, and its chief financial officer, her title, and she testified she did not know that CGL was a conduit for the Kramers' drug money. Sam did not have signature authority on the checkbook for CGL although he ran it. She and Dale Lyon had signature authorization so they could sign individually below $10,000.

Julie began to be dissatisfied in May or June of 1985 when she realized Sam had lied to her about buying land in Florida. She told him she did not want any part of development of any property outside California. He had gotten her to sign an authorization to negotiate for CGL in Florida, apparently on some other basis.

When she caught Sam lying to her about CGL's involvement with Florida real estate and the development of the marina, she said she wanted more facts before going to

certain conflict and a hassle with Sam. She went to Dale Lyon. However, she did not get a satisfactory explanation from Dale Lyon about the marina.

She then confronted Sam about it and told him that he had lied to her. Sam became very angry and suggested if she didn't like it or was uncomfortable, she should resign. Consequently, she did so and her letter of resignation was filed on June 28, 1985; when she resigned, she turned over 3,000 shares of CGL's stock, that she paid $3,000 for, to CGL as well.

Much testimony then ensued about Julie becoming a limited partner. She got married on November 4, 1983 at the beginning of LCP and had a child after "a bad pregnancy". After several months she wanted to become a limited partner. She stated she stopped attending CGL meetings in June of 1986 because she felt she was less and less needed and she was pregnant with her second child and had lost one a few months previously.

Sanwa Bank would not give them the loan they needed in late 1983 unless (1) the CGL loan was subordinated and, (2) it received a personal guarantee by a substantial person, e.g., Sam Gilbert. Sam balked on both. Sam suggested that if LCP could give twenty percent to the Gilbert family, the family would sign the guarantee, he'd subordinate the CGL loan and get a $5 million loan. So she was willing to give up 10% and asked Pierson to give up 10%.

The Bicycle Club opened at the end of November, 1984. She further testified that at first the club lost a million dollars, but between January and February 1985 it began to show a profit and thereafter made distributions.

The first distribution was $10,000 and then the next one quickly rose to $30,000, to $50,000, then $70,000 monthly, and eventually to $234,000 monthly.

She testified she used 100% of the distributions for herself and her family, and none went to Sam Gilbert or the Kramers.

She was impressed with Dale Lyon because she had watched Dale go through the debit items from May 1986 (shortly after

Shaun Murphy's arrest) to December, 1987. The court doesn't think Julie realized when she testified that Dale was sweeping the trail clear of evidence.

She had seen Jack Kramer in Sam Gilbert's office two or three times. There was nothing remarkable about the meetings and Sam had introduced Jack Kramer as an electrical contractor who had been doing work in the building.

She thought the information about the $200,000. purchase price for the Gilberts' interest came from an attorney and tax consultant, but that she never got any of the money and Sam said it was paid.

Sam wanted CGL to develop projects so he could keep his construction crew occupied.

Ms. Coyne testified further she did not participate in CGL's last Troon loan and did not know of the memorandum of loan agreement of 1983 until her deposition in July of 1990. That was similarly so for the loan agreement. She testified she never ever talked with anyone about Troon. The loan from Troon to CGL does not contain the 15% kicker, but the one from CGL to LCP did and she can't explain that.

She met with and talked with Lyon one or two times between January and July of 1986 and talked with similar frequency to David Pierson.

In March of 1989 she wrote an irate letter about George Hardie because he had been elected mayor of a town 100 miles from the club but was still running the day-to-day operation there. She criticized Hardie for a bad extension of credit which added a million dollars to the accounts receivable.

A month later after she wrote the poison pen letter to Dale Lyon about George Hardie, Julie was locked out of the locker room in the sense she stopped receiving monthly reports which the agreement entitled her to receive. When Hardie stopped sending her the monthly reports, she asked Dale Lyon for the reports and he declined.

Jules Huppert came knocking at her door in 1989 because he had just been indicted for subordination of perjury and needed

money. He had been president of Valley State Bank and had been heavily involved in the conversion of cash into cashier's checks. She did not ask Huppert anything about the charges and made three loans to him that totalled about $36,000. She made a loan to Huppert also because he had used her consulting firm for several years when he was president of Valley State Bank.

She further testified that she was not aware that LCP was making the interest payments and principal repayment of the Gilbert Family $200,000. loan from Olympic National Bank.

## DALE LYON

Lyon testified he first met Ben Kramer in Washington, D.C. in April or May of 1984, which the court finds is false;[2] further, that he had a brief walk with him and Sam. Lyon added that he had no reason to be in D.C. but went there instead of Miami because Sam Gilbert asked him to go with him, and that they were looking for real estate for the marina.

Lyon claims he next met Ben Kramer in September or October of 1984 in Santa Barbara at a boat race; further, that he met Sam at a Burbank airport and flew on a private plane to Miami for another meeting, but that he did not know Ben was going to be on the plane. He said he slept or talked with Sam, but Ben was in the aft part of the plane with an unidentified female. He came back alone from Miami.

Then Lyon testified he had a meeting with Sam in LA just before the meeting with Sam and Ben in Sam's office where he first knew Ben was to be involved as a lessee of the Marina Bay property.

Lyon claimed he talked with Mel in 1983 but not about Troon. He flew to Miami to speak with Mel but didn't speak with him and had to fly back. He said Sam arranged the trip.

That seems to be more of the pastime the court observed throughout the testimony of "pinning the tail" on Sam, a game played by some of the witnesses. Sam is fair game as (1) he's dead, and (2) Sam Gilbert was involved up to his ears and

then some. Without doubt he masterminded most of this entire scheme.

Lyon testified he spoke to about four banks early on, apparently in an effort to obtain financing before the Troon matter was arranged; and that he had Sam sign the guarantee and sent it to Mel as agent for Troon.

In early 1984 Sam instructed him to make a deposit on land for a marina in North Miami. Before the second parcel of land was purchased, Lyon testified he met Jack Kramer, that is, before August of 1984. It is certainly true that he met him before the second parcel of land was purchased, much before. In June of 1984 he Fed–X'd to Jack Kramer a document about the marina and a check.

Sam told him that CGL had to get a fifteen percent interest income participation kicker from the LCP and PPA venture; and that Lyon did not feel Sam's risk via the guarantee was that great because he had the building construction contract.

Lyon, too, said CGL lent $1.6 million to Jack Kramer's enterprises. Lyon stated that he never got the documentation for $600,000 sent to the Jack Kramer Enterprises. By July of 1985 he questioned Sam and Sam said it was to buy Lamborghini motors.

Lyon says he learned the name of Cortrust by late November 1986 from Sam or Mel. Late November, 1986, was after federal agents had interviewed him around the 19th of November, 1986, and after Dale Lyon signed checks to Cortrust in October and November of 1986, CGL checks which were then issued at Lyon's instance in the form of cashier's checks to Cortrust.

Lyon went on to testify then that he never heard any of the Gilberts ask to buy the twenty percent, and he, Lyon, did not set the price and doesn't know who did, but Sam told him what it was.

Lyon testified he didn't recall ever seeing F–68 which is a $200,000 CD purchased as a result of the Gilberts' interest and it was rolled over more than once, done on a form

**2.** Lyon did not know whether Jack Kramer and Mel Kessler were going to testify.

without a bank name on it which the court finds interesting that banks would have a generic certificate of deposit form without the bank's name printed on it, but Lyon identified the bank as Olympic Bank.

In June of 1986 the joint venture pledged a $200,000 CD at Safra Bank in California to secure a loan by Safra Bank in Miami to Jack and Maxine Kramer. Lyon testified he learned of it in September 1986 and it was a money market account, not a CD. Whichever it was, it compelled a hurry-up trip by Lyon to Miami to try to get the collateral withdrawn—all this, the court finds, because it would be a track on the trail not desirable from Lyon's point of view.

Exhibits F-35 to 57 are 23 checks all made payable to Troon, the last one dated April 23, 1986. The next payment was different; this is the payment after Shaun Murphy was arrested by Scotland Yard in Tortola. This check is by CGL, a cashier's check issued by Olympic Bank payable to Dr. Biedermann, as agent for Troon Mortgage Investment Company, Inc., for $23,832.81.

Then in June, on the 4th, there is a cashier's check by CGL from Olympic Bank to Troon Mortgage Investment Company, Inc. in the amount of $223,832 and change. Continuing on with the alleged payments to Troon, there was an account debit of Olympic National Bank on September 11, 1986, with the account number and account name being the Bicycle Club. Cashier's check number 15070 dated September the 11th is for $161,950.45.

On October 3, 1986 there was a check for the same amount drawn on CGL Investment Company, Inc. with the signature of M. Dale Lyon; interestingly enough, it's made payable to Cortrust.

Similarly on November 10, 1986, another check in that same amount, $161,950.45 was drawn on the CGL Investment Company, Inc. checking account, made payable to Cortrust and signed by Mr. Dale Lyon.

Dale Lyon, a bank president, chief executive officer at the time at the Bank of Beverly Hills who had previously been the administrative vice president of Imperial Bank and previously an officer of Universal Bank, kept them in his possession rather than mailing them to Troon. That non-transmittal would trigger a default on CGL's "loan" from Troon.

Within a week or ten days of the November 10th check, Agent Edwards had an interview with Dale Lyon in an attorney's office at which time Dale Lyon did not mention or produce the checks nor did he bring them to the grand jury appearance in Miami in December, 1986, despite the subpoena handed him the day of the interview by Agent Edwards.

Dale Lyon's testimony is he received a call from Mel asking him to make the checks payable to Cortrust.

He further testified that he could have asked Mel if only one check was to be payable to Cortrust or whether all of them were, but Lyons really didn't recall.[3]

Lyon further testified that when he went to the Bank of Beverly Hills to get the cashier's check (he was the interim CEO there), he had been in Australia most of September 1986. All the previous ones had been issued apparently at Olympic Bank.

On December 2, 1986, apparently after the interview with Agent Edwards and DEA agents, Lyon wrote Mel a brief letter asking for confirmation from Cortrust that checks be made to Cortrust as successor to Troon and that Mel responded (Lyons' Exhibit 130B) saying authorization from Troon would be forthcoming.

Witness Dale Lyon cannot recall whether he called Mel again in an effort to locate Biedermann or Troon or Murphy. Lyon testified he knew who Murphy was because he acknowledged they had talked about a missing wire transfer once. Murphy had called him. Lyon claims he did not know

---

**3.** The court made a note in the bench book at the time "witness is lying." The court bases such succinct evaluations on witness' demeanor and manner of testifying as well as evidence received to that time. Subsequent evidence strengthened rather than weakened or dispelled the conclusion.

Murphy's number or Troon's phone number.

When asked whether he called anybody, Lyon's answer was, "I may have called Sam. I may have called Sam." The court's thought at that time was the witness was trying not to give any unequivocal answer to avoid the possibility of perjury.

Lyon testified that between November 10, 1986 and the 2nd of December 1986, he made no effort to call either Murphy or Biedermann and when he was testifying it was obvious why not. He already knew Murphy had been arrested, although he may not have known Biedermann's phone number.

At the interview Agent Edwards asked about the Bicycle Club, CGL and Troon, showing him documents to Troon signed by Lyon, and the meeting was at attorney Falk's office.

As he was leaving the meeting, Edwards gave Lyon subpoenas—Agent Olsen of the DEA showed Lyon a picture of Mel and asked if he knew Mel and Lyon responded yes.[4]

The subpoena listed a number of names of individuals and business entities. Lo, like Abou Ben Adhem, Shaun Murphy's name led all the rest, followed by Benjamin Kramer, Jack Kramer, Maxine Kramer, Robert Saccenti, Mel Kessler, James Molans and Patrick Dimond, Chris Kramer and Chris Reagan (several of these names on the list we didn't hear from or about at the trial) and a number of corporations including various Apache enterprises, Lamborghini Apache Racing Team, Troon Mortgage, BV, Troon Mortgage, NV, and lots of other business entities.

Lyon said he responded to the documents mentioned on the subpoena. Lyon did not turn over the checks to the grand jury or to Agent Edwards. Lyon testified he turned over the checks to his attorney in 1987; but they were not turned over to the Government until after he had received immunity in the criminal portion of his trial and had testified.

Mr. Lyon explained to the court that he did not pick up his CGL bank checking statement except quarterly. He left it at the bank and he would come by and pick it up quarterly because he stated there was not much check activity so it really wasn't important that he do so; therefore, he did not have the checks he had written to Cortrust in October of 1986 and November of 1986.

These two checks are thirteen numbers apart which is hardly a dormant account. The court does not believe his story about why he didn't mention or produce the checks to Agent Edwards.

Lyon indicates the first borrowing as to the marina, the $2.8 million, was to complete the construction and pay off the balance of the land. Marina Bay Associates borrowed another $300,000 from Safra to finish the construction. And then at that time Marina Bay was in total default or virtually so in CGL loans. By a year later it was in total default. However, curiously enough, in August 1989, CGL wrote a one hundred thousand dollar check to Marina Bay Associates, despite the default status of the Marina Bay Associates. Dale Lyon can't remember why. He says it was for something "significant". He was the records custodian for Marina Bay Associates as well.

Lyon testified he had two conversations with Sam about the marina; that Sam said the deposit made to acquire the land in North Miami and that a second mortgage would be forthcoming, but it never did. There was apparently no concern about the fact that it had not been forthcoming[5].

Dale Lyon wrote a check for $50,000 to Team Apache on September 23, 1985 at the

---

**4.** My bench notes indicate the witness was extremely nervous and agitated.

**5.** The court made a note that the witness is again agitated. He murmured something incomprehensible. A further note right under, it

states "witness visibly agitated and fidgety after three questions today."

I recall at one time I took a recess because I thought Mr. Lyon was going to break down—not in tears, but with anxiety. He was virtually babbling.

direction of Sam, although he testified Sam had no authority to request him to write a check to Marina Bay Associates. Lyon said the marina was Sam's pet project.

Lyon testified further that a check for $250,000 was, as directed by Sam, paid to the law firm of Latham and Watkins. The check is dated October 19, 1987, and that a fifteen thousand dollar check dated March 24, 1987 went to Richard Kirschner, who is an attorney for Julie Coyne.

And again he says Sam told him to do it and that CGL—at that point in time, Sam, Michael Gilbert and Dale Lyon—chose to pay back a partial payment of $9.5 million to Troon despite Troon's demand that it all be paid back: CGL kept one and a half million dollars claiming it was necessary for withholding taxes.

The court notes that one and a half million dollars apparently is still sitting there in a CD, plus there is some money in the LART account in England.

No payments have been made to Troon since the nine and a half million dollar payment in January 1987.

Lyon does not know who the new 25 percent limited partner in Marina Bay Associates would have been at the end of January 1985. *See* Government Exhibit 942. The name blank with a percentage of the new limited partners is not filled in but the form is signed by Michael Gilbert and M. Dale Lyon and by Robert D. Gilbert also.

The new partner was supposed to be bringing $400,000 to the Marina Bay Associates which was needed and Sam claimed he had an investor but didn't tell Lyon who the investor was. On the 19th of December 1985, Bell wrote to Lyon the new limited partner was to be a foreign corporation or foreign entity.

Consequently Marina Bay Associates finally borrowed $200,000 from Safra in 1986.

Dale Lyon does not recall when he prepared F–83 which is the status of disbursements. He recognizes F–15, the statement of disbursements to Kramer, as his handwriting. Lyon testified he thinks he prepared F–15 in November or December 1985 and now says that F–83 had to be prepared after November, 1985. Lyon denies sharing or giving the original of F–83 to Jack Kramer.

In F–83, an account of monies going to Jack Kramer, Lyon believes Super Chief North is Emerson Allsworth and that it went to Emerson Allsworth's trust account to buy land adjacent to the marina.

And he thinks the Team USA listed on the exhibit is Don Aranow. [The court would point out Aranow has since been murdered.] But Lyon indicates that he did not disburse $476,000 to Team USA to the best of his knowledge. The court notes that there is under Team USA an insertion listed as land, $600,000, but that entry is unclear and the court makes no finding.

There were two checks to Emerson Allsworth, one for $25,000, one for $80,000; further that on August 28, 1984, there was a Safra Bank's cash-in ticket for $340,000 presented by SGA Parking, one of the Gilberts' money laundering entities.

Exhibit 757 reflects three cashier's checks issued by Safra to the Emerson Allsworth trust account.

Sources of the application of funds are listed as $2.8 million from Safra, and $504,000 from Troon went to the marina, although the court can't make a specific finding about the $504,000 from Troon.

At the Edwards/Borah interview Lyon did not tell the agents about the $500,000 distribution or disbursement to Jack Kramer or the $200,000 CD at Safra Bank nor the $1.6 million to Jack Kramer.

Lyon testified that without the five million dollar loan from Sanwa Bank in late '84, the club would not have opened and he risked all of his net worth then by signing a personal guarantee.

The policies broke down at the club because the volume was so heavy. The Club had expected to need five hundred to six hundred employees but had eight hundred to nine hundred.

The testimony of Lyon continued that one-half billion dollars a year in cash comes into the Bicycle Club.

Lyon denies he stopped active involvement in the Bicycle Club in April or May of 1986 because of Murphy's arrest and claims Sam was trying to kick him out because of Sam's difficulty working with Lyon.

Dale Lyon recalls seeing Barclay's Bank in Tortola. He was in Tortola with his wife Maureen to use Mel Kessler's boat which was berthed there. Lyon claimed he did not see Murphy at the time.

### THE OTHER WITNESSES

Mr. Traweek started off in his description of Sam Gilbert that Sam was given credit in Los Angeles for developing the Ventura Boulevard strip. Pierson wanted Traweek to help him found the Olympic National Bank; Traweek and Sam did so and were founding directors. He observed Sam was obviously in charge; when Sam entered a room he "took over" plus his negotiating skills were premiere, but Sam told people only what he thought they should know. Sam came to him about the Bicycle Club and said he thought there was a great deal of weakness in the group beginning the Bicycle Club—which is interesting because Sam handpicked the players. Sam told Traweek there had been a cost overrun and he, Sam, was on a $3,500,000 guarantee and that Sam felt he could get 10% participation for Traweek as a fee for arranging the financing. Traweek had a friend at Gibraltar Savings & Loan and was able to get the conventional $3½ million loan there. In addition, Traweek gave a $250,000. loan of his own to LCP.

However, LCP and Sam were not living up to their end of the bargain. Traweek kept asking about it, but Sam said he couldn't get the 10% from LCP but he could get 5%. When Sam was trying to bargain him down to 5%, Traweek remembered when Sam hoodwinked two law firms on a lease. Sam refused to reveal the names of the Club's money source and said that David and Dale did not know them. Obviously, Sam was in his coverup mode

throughout these proceedings because Dale certainly knew. He had worked both for Sam and the Kramers in this operation.

Traweek finally got his 5%, but not before December, 1985, and that 5% came from Dale Lyon. In two years he received over $400,000 in distributions and in May, 1987, he sold the 5% back to Lyon for $1.3 million. The reason Traweek said he sold the 5% was that he needed cash at the time, which was plausible in view of the fact that Traweek had more than 50 loans from Olympic National Bank over the years.

The question the court has trouble understanding is why LCP needed $250,000 from Traweek when it was sitting on the $200,000. it had just gotten the month before from Olympic National Bank on the Gilberts' transaction which it put into a CD. The court has no answer for that because either the evidence had been limited, covered up or was not produced for whatever reason.

Hardie raised about $400,000 or $500,000. for Park Place Associates (PPA) in two or three months in order to obtain the license, entered the site development contract with the City, and brought the idea to the table but PPA needed financing. Hardie described the financial market when he was trying to build the club as he could not get people to invest because (1) some thought the market was saturated; (2) there was a bad aroma over the industry as several municipal officials had been indicted; and (3) the building couldn't be sold for any other marketable use.

Sam Gilbert insisted on building the Bicycle Club according to Hardie and Hardie understood the lending deal was for 15% interest (plus a 15% "kicker"), which was agreeable to PPA because money was tight; so Hardie agreed to it because Hardie wanted to get the club built and in operation. Sam said he would be the one primarily involved in obtaining the financing and the money was coming from an offshore trust and a holding company would be formed under CGL. Hardie and Lyon were the Chief Operation Officers in getting the Bicycle Club going.

Card games were limited to panguini, lowball and high draw, although five card

stud and seven card stud are now permitted. Five card draw is too slow for casino profitability.

At preliminary joint venture meetings Sam Gilbert did not speak. Hardie did not remember Julie Coyne saying anything or even being there at the preliminary meetings. Neither Dale Lyon nor David Pierson knew anything about Asian games. Sam Gilbert was a "very forceful and difficult person"; further, that people were generally deferential to Sam Gilbert.

The Bicycle Club executive meetings were held at the club. Sam attended all of them for a year and one half; it was rare for Sam not to be present. Sam ran the show for LCP at these meetings. Dale Lyon attended almost all the meetings. Julie Coyne and Robert Gilbert attended most. Michael Gilbert attended some of the meetings. Hardie said the books and records were in poor shape which squares with Pierson's testimony. Hardie intimated Lyon's performance was not up to a $90,000 salary. Hardie, of course, felt that he himself was underpaid as general manager.[6]

After the federal agents interviewed Hardie on November 19, 1986, he asked Sam about the names of Troon, Ben Kramer, Jack Kramer and so forth and Sam told him that it's nothing. On another occasion, he described Sam as "strong and authoritarian".

Sorrentino had also been in the banking business and in 1984 she worked for the Valley State Bank in Encino. Jules Huppert, who was engaged in the money laundering aspect, was President; Ms. Sorrentino was surprised that the $1 million loan in January of 1985 to Sam Gilbert was collateralized. But she testified that Jules Huppert wanted the collateral and she thought it was odd. The court concludes Sam didn't want anything that looked the least bit

suspicious to a banking examiner or to a federal agent if either came looking.

Ms. Sorrentino in June, 1986 went from Valley State Bank where she was a commercial loan officer to the Bank of Beverly Hills where Dale Lyon was the Chief Executive at that time. A whole series of exhibits (Lyon 148(A–D)) show the $600,000 unsecured loan from Valley State Bank to CGL in June of 1984 which was rolled over in November, after a phone call from Dale Lyon, for $500,000. It was rolled over again and renewed and renewed again, as well as another note for $100,000 (Exhibit 148).

Crasnick found Lyon's Bicycle Club books and records to be in good shape. That didn't square with either Hardie or Pierson's testimony. Crasnick described Sam Gilbert as a very "demanding individual."

An interesting bit of evidence appears on the records: "note receivable B.K/Club in amount of $11,477,005.71. Crasnick says it was a typographical error. It appears not only on page 3, but on page 4. But on page 4, near the bottom was another entry, abbreviated interest income, capital B, capital K slash club. At that point Crasnick adamantly said B–K did not mean Ben Kramer and wanted his workpapers to explain it.[7] Later Crasnick testified B–C means Bicycle Club and he explains the notation about the B–K as that it is simply different bookkeepers. The court doesn't find that very convincing.

He testified that he recognized Dale Lyon's handwriting. He knows of no other $500,000. payment by LCP in 1986 except the $500,000. to Jack Kramer. He appraised Government Exhibit F–15 made by Dale Lyon as a pretty good summary of the advances to Jack Kramer.

Crasnick was told by Sam Gilbert he was to be a co-trustee on Robert Gilbert's Family Trust and Michael Gilbert Family Trust

---

**6.** I made a note to myself at the time that Hardie's pauses make me question whether Hardie thinks Lyon's efforts matched his compensation or distributions although Hardie's answer finally was to that effect.

**7.** I made myself a note as I often do in non-jury matters on observations of witnesses because it does bear on credibility in a strong way.

My note to myself is as follows: "Doth the witness protest too much?" His unruffled demeanor certainly became testy. He testified with total aplomb the rest of the time.

and claimed the payment of $75,000. during 1990 to Michael Gilbert was not a distribution, but it really was a loan. There were no loan papers made up at the time. The loan was in March of 1990 during the criminal portion of this case.

Crasnick further testified that he, Crasnick, set the rate of the loan at ten percent and the maturity date at one year from that date. A direct conflict exists between this testimony and that of Mr. Sommers, the second co-trustee.

Crasnick did not know about the agreement of LCP to pay Michael, Robert, and Margaret Gilbert's interest on the $200,000 loan to the Olympic National Bank.

Crasnick testified that the next day after he became co-trustee of the Michael Gilbert Family Trust, presumably on the 29th of November, 1984, the corpus of $25,000 was all invested in LCP by the co-trustee, Fainsbert, without consulting Crasnick.

Crasnick was put out about this as he felt it was not "very sound" to invest all in a new business because there is some speculation to that or to any new business.

And the court notes that would seem to be especially true since the prior club named Huntington Park was in receivership at that time.[8]

Michael Gilbert's office is one floor above Crasnick's office.

Crasnick testified that Huntington Park paid his fees until the fall of 1986 or 1987. These are fees in connection with the litigation of the Bicycle Club and two smaller clubs and they decided to file suit and then moved to consolidate.

The litigation is still going on. The litigation is apparently about whether it's gambling or not a violation of state statutes. Both bills to modify the 1891 gambling statute have been vetoed.

## LYON FAMILY TRUST

That Trust was formed in June or July of 1988 and Dale Lyon's brother-in-law, R. Martin, is co-trustee and Fainsbert is the other co-trustee although Martin has never talked with him. The brother-in-law's fee is $300.00 per month. Mr. Martin doesn't know the source of the initial $46,800.

As to the Lyon Family trust, Dale Lyon indicated he set it up with the idea of the gift tax maximum of $600,000 and that he gave two percent of his share of LCP and the Lyon children did not pay anything for their interest.

Various testimony was put on that the Bicycle Club was adequately capitalized and CPAs liked to see sizeable capital contributions from ostensible owners. Of course, Julie Coyne, testified that she bought her 30% with $1,000. Her stock does not appear to meet the accountant's definition.

There was stock of $16,500 in CGL, but there was testimony that there was cash in CGL of $19,500., but that 99.9500% of all money going into CGL was loan money. At the end of 1984 CGL's capitalization percentage would be $16,500 divided by $12,000,000., or much, much less than 1%. The Bicycle Club, the joint venture, at the same time had a negative capital asset structure. PPA made no capital contributions to the joint venture and LCP did not either.

From the evidence the Bicycle Club is adequately capitalized if Ben and partners are the real owners, but not so if Ben's money was found to be only a loan.

Mr. Kavanaugh's appraisal of the land and buildings in 1986 was $16,500,000.

Mr. Comer testified on the casino's value and seems qualified in the area of casinos, although this kind of card club doesn't fit into the profile of a Nevada or New Jersey casino and much of his testimony does not translate to a card club. He finds nothing unusual about a 15% rate of interest or a 15% interest participation for a mortgage.

Mr. Bass was financial director of the City of Bell Gardens and is at the present time interim trustee of the Bell Gardens

---

**8.** Apparently the opinion of the Sheriff of the county where the Huntington Park Club was located was that its operation was gambling. That was part of the reason it had gone into receivership.

Bicycle Club. There was a referendum on the City's ballot about the club and it passed with a 65% favorable percentage.

His testimony about Sam Gilbert was simply that Sam Gilbert called the shots although Lyon, Coyne and Pierson were there. Sam Gilbert signed the guarantee and he found that Dale Lyon was always difficult to catch at the club and didn't always have the information at hand. In 1985 and 1986, George Hardie ran the gambling part of the club.

## KAREN GILBERT

Karen Gilbert testified that her interest is one-half of Michael Gilbert's 6.67% in LCP as his spouse and that the Bicycle Club income was spent on family expenses, investments, such as a condo at Mammoth, a condo for her mother, etc.

She was in Sommers' office or her office on August 1, 1990 when the note for the loan from the trust to Michael Gilbert was signed.

Amazingly, the court might add, she testified that the first time she remembers meeting Ben Kramer, Jack Kramer or Mel Kessler was in October 1986 after a boat race apparently in Florida as Apache Marina was operational, but Karen Gilbert also testified she met Jack Kramer at a Thanksgiving dinner at Sam's house in November of 1983. Maxine Kramer was there, but she did not recall if Ben was there. She testified she met Mel here in Fort Lauderdale during the course of the proceedings. The court finds that to be erroneous at best. She met Ben Kramer again in California at the race at Del Rey or Oxnard. Ben Kramer was National Offshore Racing Champion in 1984.

She says there is a big safe in the bathroom but believes it's only been there for three years, but her testimony was not clear.

## ROBERT GILBERT

Robert Gilbert said no one in his family went to the bank and he signed the check. His 10% of LCP comprise the 6.67% he has with the balance in his children's family trust. The trust paid $33,333.33 and Robert Gilbert paid $66,666.67 for the total of 10% interest in LCP. He learned from Michael that the siblings would get 20% and what the purchase price would be.

Sanwa Bank wanted the Gilberts' signatures on a guarantee for a $3.5 million loan. He said signing the guarantee was frightening although he had more net worth than that. He borrowed money for the money he put into his family trust from Olympic National Bank, approximately $80,000., and he assumed the Trustee would buy into the Bicycle Club.

Robert did not pick Fainsbert, but Michael recommended him. Robert continued that he believed that "everybody knew the money was going to be invested in the Bicycle Club. I knew it." He testified he asked Sommers as trustee a few months ago for a loan from the trust of $75,000. for legal expenses.

Re-enter Don Crasnick. For twenty years Crasnick was the accountant for Sam Gilbert & Associates. While he was in Sam Gilbert's office, Sam said to Crasnick that, "Michael will be coming to you and I want you to be the co-trustee of his family trust." He testified there was a change of duties as co-trustee when Hubert Sommers became co-trustee in January 1990, but did not explain what those changes were. Apparently it was to do things more orderly rather than on the good-old-boy basis, judging from the preparation of the note or Fainsbert's investing in the Club without Crasnick's approval.

Crasnick said as to the Robert Gilbert Family Trust that he made the investments and that he had made all the investment decisions for both trusts. The court finds that totally contrary to his own testimony earlier where he testified that Fainsbert made the investment in the Bicycle Club for the Michael Gilbert Trust and that he thought it wasn't very prudent.

Crasnick testified that he received information from Dale Lyon about a check, although nowhere on the document does the name Cortrust appear. It always was that way when the check was made payable to Cortrust. He credited it to the Troon Mort-

gage payments. The check does say Troon Mortgage on it, although it's payable to Cortrust.

Crasnick looked a little surprised when he looked at the check, Exhibit F–15, and testified that it looked like Lyon's writing. He previously indicated he could identify Dale Lyon's handwriting. He positively identified F–25 as Dale Lyon's writing.

Sommers testified that he replaced attorney Steven Fainsbert as co-trustee of the Trust and that it happened because Fainsbert was across town while it was more convenient for Sommers because he was next door to Sam Gilbert & Associates. He had represented Michael Gilbert in Michael's first divorce. He became a co-trustee in July of 1990 of the Michael Gilbert Family Trust through designation of adult beneficiaries.

When he reviewed the affairs of the Trust, he realized a loan had been made in March of 1990 but no loan documents had been prepared; they were prepared in October, 1990. He claims it was done then because he became co-trustee of the Robert Gilbert Family Trust because of court proceedings (necessitated because there were no adult beneficiaries of the Robert Gilbert Trust) and his court appointment wasn't made until October, 1990.

Fainsbert stopped functioning as co-trustee in January of 1990, although his resignation did not become effective until May of 1990.

Sommers testified that he, Sommers, set the interest rate on the Michael Gilbert note and that he insisted on the Michael Gilbert house as collateral. His testimony is squarely contrary to that of Crasnick.

The court has to believe that Sommer's testimony is credible and Crasnick's is not. For one thing, Crasnick couldn't keep his own story straight in two different installments of testifying.

The other thing is although both of them have had other representation of various Gilbert family interests, Sommers seemed a lot less involved there than was Crasnick although one could certainly say that Crasnick's greater knowledge of Gilbert matters would make him more credible.

Here again, Sam told Sommers before the club was built he wanted the profit from the construction company but had no confidence that the club would be successful.

Sommers also testified about community property or marital interests in California. As to the actual facts of this case he testified it has not yet been decided in California: consequently, he couldn't answer the hypothetical question by AUSA Bondi about when a husband, who robs one million dollars from a bank and puts the proceeds into the couple's joint bank account, whether the wife's one-half community property interest would be subject to a constructive trust in favor of the rightful owner.

Steven Fainsbert was engaged by Sam to draft the construction contract for the club. His office and a paralegal formed CGL.

Fainsbert guessed Hardie, Lyon and Pierson, the general partners, hired him as attorney for the Bicycle Club.[9] His practice is more than 90% in real estate law.

Fainsbert testified he prepared the loan agreement between Troon and CGL, but never met or talked with anyone at Troon and he got the information for the loan agreement from Dale Lyon.

Fainsbert testified he had no idea what Troon was but that several years later he had a demand for a payoff from a man in Switzerland. He once asked Dale Lyon what Troon was and Lyon said that Sam knew the people or their agent. When he met Mel Kessler at Sam's office, Sam introduced him as attorney and agent of Troon.

Fainsbert testified he was to prepare documents in connection with the building of a marina by Sam, Michael Gilbert and Dale Lyon. Sam, Michael and Dale were the limited partners. CGL was to lend money to the Marina Bay Associates and limited

---

9. The court made a note both in the dots I put in his answer and in brackets in a note to myself that the dots indicated a long pause in his answer which I felt unusual, particularly because he didn't remember who hired him as attorney.

partnership with a leaseback. Thorndyke Enterprises, Inc. was the general partner in the joint venture of Marina Bay Associates. Thorndyke apparently is the name of Michael Gilbert's dog and it is a corporation, which is essentially Michael Gilbert.

He remembers flying the "red-eye" to Miami with Dale Lyon and Michael Gilbert for a meeting in a hotel in connection with a lease. Jack Kramer was present and Emerson Allsworth also was there representing Jack Kramer. The meeting was about a lease of Marina Bay Associates and payments not being made by Apache.

Later on, Dale Lyon and Michael Gilbert went from a limited partnership to being general partners in Marina Bay Associates. But Fainsbert, according to him, was the one involved in the meeting and he said in a polite way, pay up or get out. Lyon wanted him to take this hard line.

He prepared the fourth amendment (although the new partner's name was never filled in) to the limited partnership (Marina Bay) which he discussed with Dale Lyon and Michael Gilbert. Sam told him Allsworth was going to be the attorney for Jack Kramer at an L.A. meeting and then Fainsbert described that L.A. meeting as the first one where he met Allsworth in late 1984 or early 1985.

The court finds that Mr. Fainbert's memory seems to be conveniently inaccurate. Convenient for him as to times. I guess that's not surprising when one recalls in the testimony that he denied any knowledge of a meeting he had with Donald Bell and Dale Lyon.

When AUSA Bondi confronted him with a 12–page letter [10] from Donald Bell about the meeting, Mr. Bondi asked Fainsbert if he read the letter from Donald Bell, would it refresh his memory? About the only instantaneous, unequivocal answer Fainsbert gave the government in the entire direct or redirect examination by the government was then when he answered "no". This court has never heard any witness answer "no" to a question like that, especially when it was a 12–page letter describing a meeting in which only three people were present, only one other besides the witness and the writer of the letter, Donald Bell, whom he had practiced law with, and that other person at the meeting was Dale Lyon. His memory, and, therefore, his credibility, are suspect. He had no such difficulty testifying on cross-examination by the claimants' attorneys. He does recall that CGL lent $1.6 million to Jack Kramer.

Fainsbert says he dealt with Mel Kessler on the Troon/CGL loan. Dale Lyon told him Troon would lend up to $20 million. The terms of the CGL loan were to track the terms of the Bicycle Club loan. Lyon told him the rate was 15%.

Fainsbert represented both CGL and LCP because Lyon, with Pierson in the room, said that Sam hated lawyers and did not want another attorney involved. Lyon told him that if the Bicycle Club was sold, CGL would receive 15% of the sales price.

A letter in February or March of 1987 from LA attorney Gillam gave the name of Luxembourg and sent directions to Becchio, Wehinger & Juri, attorneys in Zurich, Switzerland, to send the money to Luxembourg. And he speculates (he seldom gave unequivocal answers) that Gillam may have come in as attorney for Sam and Michael Gilbert.

Gillam told him to prepare a resolution for the directors of CGL which approved and ratified such instructions. Then Fainsbert indicated this whole thing was bizarre.

Donald Bell, a tax attorney in Las Vegas and Los Angeles, provided strong evidence. Bell testified that Fainsbert called him and said he wanted to consult in behalf of Lyon, et al; regarding tax implications of the Bicycle Club. So he met them in Bell's office.

Lyon gave the information about Troon and the Liechtenstein trust. And that's reflected on page 4 of Bell's letter, F–26. Paragraph 12–A reads as follows:

---

10. Fainsbert used to be in the same law office with Donald Bell and acknowledges that the signature is Donald Bell's handwriting.

"The Virgin Islands corporation in turn borrowed the funds from Troon Mortgage Investment Company, a corporation domiciled in the Antilles, (Not the Netherlands Antilles), who in turn borrowed the funds from a Liechtenstein trust. According to Mr. Lyon the stock in Troon is owned by a Liechtenstein trust and I do not know the distribution of the stock in the British Virgin Islands corporation or its name."

The only people present at this meeting in Bell's offices on June 27, 1984 were Steven Fainsbert, the addressee of the letter, Dale Lyon, and the writer of the letter, Donald Bell. Bell's testimony was that he asked Lyon where the money comes from, and that he got no information from any other source. Lyon testified he did not read Bell's letter of July 5, 1984, but that Bell did not get that information about Cortrust from him. The court finds that testimony of Lyon unworthy of belief. Bell has no reason to give any testimony other than the whole truth.

## CO–DEFENDANTS' TESTIMONY

### JACK KRAMER

The last two witnesses, co-defendants Jack Kramer and Mel Kessler, gave testimony which illuminated many of the areas of this whole matter that were in dark shadow.

Kramer's credibility comes into question in two ways:

First, he was a co-defendant in this case and was convicted of money laundering plus his interest, if any, in the Bicycle Club was forfeited by the jury. Secondly, apparently when the Government and Mr. Kramer began to talk about the possibility of his testifying, he lied to the agents and his explanation was that he did so to protect the reputation of Emerson Allsworth, his friend of 37 years and his lawyer.

Mr. Kramer probably is quite aware that a lawyer doesn't have to be convicted to suffer great damage to his professional reputation as well as his personal one and so that reason given seems credible.

The court doesn't know exactly what went on between the Government and Jack Kramer, but the court doesn't find the Government made any deals with him for his testimony. The court finds Jack Kramer to be a credible witness.

In September, 1983, Jack Kramer traveled to the Pierre Hotel in New York City and met Ben and his partner Tom whose real name is George Brock. In September of '83 they believed the investment to be a $12 million dollar investment. The investors were to be Ben, Tom and Randy Lanier. Those were the three kingpins or de facto board of directors of the smuggling enterprise that was described previously, although from the evidence in this case it seems to have been basically Ben's enterprise.

Jack Kramer met with Sam Gilbert at L'Ermitage Hotel in Beverly Hills in November 1983. When he met with Sam, only the two of them were there. The conversations were described earlier.

On November 29, 1983, Dale Lyon flew to Miami for a meeting and stayed at the Holiday Inn. And the purpose of the meeting was to meet with Ben Kramer; Lyon had rough drafts of the legal work for CGL, LCP and the Bicycle Club.

Fainsbert was the attorney for Sam, who was also at the meeting, as was Allsworth who represented Jack.

Jack Kramer's testimony was, and the court's understanding then was that "Ben, Sam and I were partners." This court finds that is so as to both the marina and as to the Bicycle Club in some aspects of operation, but they were not partners in the investment in any way. First off, Ben put up his money; Sam almost never put up his money in investments—other people's money, but not his. Although he did execute guarantees with respect to the Bicycle Club, those risks were basically compensated by his anticipated construction contract profits. Clearly Jack was not a partner in ownership and the court finds that neither was Sam.

Jack Kramer testified, "As far as I was concerned, Dale Lyon was Sam's employee."

Jack Kramer and Sam flew to Liechtenstein in November, 1983 to establish the trust.

Jack Kramer went to California in March of '84 for a meeting at the "storefront." His description of the mission was to "show the flag"; that is, that the Kramers had owners' interest in the Bicycle Club. Jack met Dale in the storefront which was an office during construction of the Bicycle Club building. And Dale Lyon had a spread sheet, a computer printout of construction costs, and so forth. Dale Lyon gave Jack Kramer this confidential copy.

Jack Kramer and his wife had gone to California and were house hunting, as they had planned to move there. In fact, one of the sites they were considering was located on Rising Glen Road and Michael Gilbert had signed a lease for them. Julie Coyne had opened an account for Jack Kramer at Olympic National Bank at Sam's instructions. Lyon suggested a couple of houses originally, but Sam vetoed them because they were built on fill and wouldn't hold up.

While he was there, Lyon told him that as to the $1.1 or $1.2 million in cashier's checks, the records of them would be destroyed and would never see the light of day, which is corroborated by Mel Kessler's testimony. On cross examination Jack testified that Dale Lyon said no records of cashier's checks were on microfiche, but that they had all been destroyed. Further, that the organization was originally supposed to be CPL, not CGL, and was supposed to manage Ben's money.

Jack Kramer broke his ankle in six places testing a boat in April, 1984. Prior to April, 1984 he had numerous meetings with Dale Lyon about the club. After Jack's boating accident, Sam thought that Jack's time would be better spent in Florida. Jack Kramer's ankle took some time to heal and two different operations were required. After the first one he spent ten to twelve weeks in a cast and the second one required five to six weeks. The second cast was not off until November or December of 1984.

Jack Kramer said he only flew to California three times while in a cast. As a result of that Lyon flew to Miami more often; Kramer's description was "frequently". Lyon came at the direction of Ben, staying at Turnberry Isle. Lyon has an accounting background and he provided feasibility studies. Meetings were not held on the phones because of confidentiality.

Lyon was coming to Florida every five to seven weeks and stayed for three or four days, advising Ben on money and investments. Ben liked to use people who were serious and skilled in their trade or occupation. And that's why Jack Kramer called Lyon an advisor of Ben's.[11]

Sam had told him in California that Sam would get resignations of all the stockholders and partners in both CGL and LCP and once Sam said he had them in his upper right-hand desk drawer. That representation seems very probable to the court and that they have never come to the light of day, this court must conclude, for either of two reasons: They were destroyed after Murphy's arrest in Tortola or after the interviews of Claimants by Agent Edwards and the DEA agents. Or, secondly, it was another one of Sam's lies such as the ones to David Pierson, to Julie Coyne, and so forth (e.g., as related by Traweek) described earlier in the court's findings.

Jack Kramer went to New York City to the boat show in January 1985 to make a deal with Lamborghini and put on a "dog-and-pony" show in an effort to persuade Lamborghini to let the Kramers be sole distributors of Lamborghini's marine engines in the U.S.

For logical and credible reasons Ben Kramer and Jack Kramer made it a requirement that the Kramer names never show up on the marina documents. And of course their names did not show up on the Bicycle Club documents either. Lyon nev-

---

11. The court made a note in its bench book "Witness (Jack Kramer) very sincere today, too."—also, and in all caps, 'CREDIBLE'. Shortly thereafter, a further note "Jack Kramer an- swers quickly and unequivocally"—unlike several of the California witnesses, his answers were too direct to be made up.

er asked why. The Kramers leased space in the marina and building they owned simply as part of the continuing subterfuge.

Jack Kramer was at Michael Gilbert's house for a meeting near the Super Bowl or in football season. The general theme of what happened at the various meetings is far more important than the dates.

Jack Kramer had some interesting testimony that the court finds credible: he remembers that Michael Gilbert had a carpeted garage and he had never seen one before; it had tables and chairs in it in order to watch the game. He remembers that Michael Gilbert's house clings to the hillside on six levels. In a home worth $700,000 or $800,000, a carpeted garage does not seem out of the question. It was one of those matters in his testimony that Jack Kramer was so definite about. In watching his expression the court concluded he observed it. If it was not so, the Gilberts could have brought in rebuttal testimony but did not. So it stands unrebutted.[11]

At this meeting Ben was there, Michael and Karen Gilbert were there, although her role was mainly to provide refreshments. The purpose of the meeting was to discuss the Bicycle Club. There was concern on the part of the Kramers (or it may have been their lawyer, Allsworth), because their name was not on any documents and, therefore, how were the Kramers to be protected? Allsworth said that you have to trust someone. And so they asked him, trust whom? The answer was Sam.

Revealing was a question to Jack Kramer: "Did Dale Lyon ever ask who are you in the Bicycle Club?" The very affirmative, clear-cut answer was, "Of course not."

Monies were sent to the Allsworth trust account for Jack and Ben, which had to be from Sam and Dale. And in this connection Jack said, "I signed drug store notes each time I received a check for our own money." Later it took the form of a loan agreement. Jack Kramer testified he signed the notes "to cover the fact it was our money. We were Troon Mortgage Company" ("We" being the Kramer interests.)

It came out twice in his testimony, each time Jack Kramer referred to the principals in LCP and George Hardie as "Scruds." The other reference to these named principals as straw persons is quite clear. Apparently, they were the "front persons" to give a clean appearance to the operation.

Then came the colorful testimony that the "devil raised his head," meaning that that is when greed replaced friendship. It's because the Bicycle Club began to make money and Sam decided the Kramers' interests were to vanish. Because they had their name on nothing, that was fairly readily accomplished.

When Robert Gilbert was testifying, something Robert Gilbert had written the court for the pre-sentencing report prior to the sentencing of his brother, Michael, sprang to mind: that his father once stated his greatest joy was to stick a knife in a man's back but the man wouldn't know it until he got home at night.

Robert corrected that description in his testimony to say that what Sam had actually told Robert was that his greatest joy was to cut off a man's testicles and the man wouldn't know it until he took his briefs off that night.

The Court finds that Sam struck again when the Bicycle Club began to make money and pushed the Kramers (actually Ben, Randy, and Tom) out of the Bicycle Club.

When Mel told Jack in 1986 about the arrest of Shaun Murphy, Jack "began to pull up stakes".

Fainsbert, Allsworth, Max Forman, the accountant, Dale Lyon and Jack Kramer met at a Miami Marriott in April 1986 after Murphy's arrest on how to get out of the marina. Jack states that Forman was not

11. Although the statute does not provide specifically for rebuttal evidence from claimants, this court offered claimants that opportunity.

involved in money laundering, but was only an accountant.[12]

Jack Kramer testified he became very angry and obviously is still irritated about it because, "these men, Fainsbert, Lyon and perhaps Michael Gilbert were telling us what to do with our marina."

Sam had reduced their participation interest to the 15 percent kicker and the California people at the meeting said the kicker dies with the loan and expressed plans to refinance the loan.

So Ben and Jack decided to get out what they could. The money was to be sent to Biedermann's attorneys in Switzerland, Becchio, Wehinger and Juri in Zurich.

When Jack Kramer learned how much money had been sent to Switzerland, Jack was unhappy with the amount. Dale Lyon said the amount was a million and a half short in order to cover U.S. taxes. Jack testified he found out the "real use" during the criminal trial, but there is no further evidence on that and the court can make no finding. Jack Kramer flew out to California after December 1986 to get the one and a half million and met with Dale Lyon.

Jack talked about the marina with Lyon. Lyon said one might use a "foreign investor." Sam had the records changed to provide for that possibility.

In 1986 and 1987 Jack was running the marina and Lyon, Michael Gilbert, Jack and Ben Kramer wanted it to look as if the water taxi was thrown out of the marina. As he described it: as "subterfuge", one more part of the ruse.

In August of 1987 Ben was indicted in the Central District of Illinois and arrested, and government agents seized both Apache Marina and the boat building business.

When Jack left in 1987, Michael Gilbert and Marina Bay Associates came in. Ben and Jack had written it off—i.e., "closed" the marina. They couldn't see how they could sell it that quickly.

After Murphy's arrest, Ben and Jack "had damage control discussions first"; then with Sam and Michael Gilbert; and then with attorneys Fainsbert and Allsworth.

Dale Lyon gave him F–83 in April, 1986. Jack requested it about the Kramer monies that had been invested.

As Jack Kramer testified, nothing was done on a helter-skelter basis.

Jack Kramer said he lost control when he broke his ankle and did not come out to California to head up CGL. That makes sense and the court so finds.

Kramer testified that Allsworth was a participant and Jack thought Allsworth knew about the transfers to his trust account being money laundering, but subsequently he testified that Allsworth was not aware of the overall money laundering scheme.

Allsworth took the Fifth Amendment.

The one area where the court had trouble with Jack Kramer's testimony is where he testified he did not apply for the false British passport. He assumed that Ben and Tommy did. It seems like such an indefensible position to take that maybe it has a ring of truth to it. A finding either way is not critical.

At the meeting in November, 1983, Dr. Biedermann asked Jack and Sam if the money was coming from legitimate sources and Sam said yes. Klaus Biedermann told Sam and Jack, that's how to do this: set up the trust and that part of the money flow; Klaus did not know it was drug money, but knew that it was being laundered.

Jack testified that Sam was dissatisfied with a number of things and the people at the Bicycle Club. For example, Lyon, Coyne and the chief of security. Jack Kramer thinks Sam felt vis-a-vis Lyon and Coyne that Sam was losing control. Dale Lyon told Jack he was being forced out of the Bicycle Club by Sam. Later Dale Lyon said he had left the Bicycle Club.

Except where otherwise indicated, the court finds Jack Kramer's testimony to be credible.

---

12. The court notes, however, that Forman was also the accountant in a large Delray Beach cocaine distribution case before this judge.

## MEL KESSLER

Mel Kessler testified without any prior agreement with the Government except it would not be used against him and the government would advise the court about Mel Kessler at any Rule 35 hearing.

Kessler met Dale Lyon in New York City at the Pierre at the meeting of October 21, 1983. (See Exhibit F–31 as to Lyon's presence). Dale Lyon was introduced as Sam's associate. It's unclear whether Jack Kramer was in this meeting. At the meeting the problem discussed was the real owners wanted the managing director to be the alter ego of the real owners, but they didn't want the real owners named on paper. Ben was elsewhere in the Pierre, not at the meeting; Mel learned that from Sam and Dale Lyon.

While discussing the Tortola director's fee, Lyon said he needed to go upstairs to talk with Ben about the funding. Dale Lyon came back down and reported Ben said he could live up to providing cash for the construction draws.

The court finds that Lyon had to have met Ben before that because the others would not send someone Ben didn't know as an emissary unless there was at least a phone call by Sam prior to that to tell him Dale Lyon was coming up.[13]

Mel was at the first Trident Center meeting in November to represent Jack Kramer. Fainsbert and Sam were there. This corroborates Jack Kramer's testimony about when he met Fainsbert. Discussion was about a token entity, Troon. Fainsbert said he met with Allsworth that morning. Allsworth had then left L.A. Fainsbert had papers with him in connection with LCP and one of other of the entities and arrived with Sam.

Fainsbert asked, apparently in the morning, "How do we protect Kramer's money?" Allsworth had said, "You'll have to trust Sam." [This conversation may have occurred at a different meeting, with the Kramers present.] At the first Trident Center building, David Pierson was wearing a white suit.

Mel said he was there to hold Jack Kramer's hand and discuss the banking problems with Dale. At this meeting Mel recalls Pierson only because of the white suit, except he did arrive and leave with Ben Kramer.

The next meeting was shortly after and had all of the defendants including Sam present, plus it also included Dale Lyon, Karen Gilbert and Fainsbert; the meeting was at Michael Gilbert's home in the dining room. It's not clear to Mel if Pierson was there, but Pierson indicated he was. (supra, p. 715) Mel and Jack arrived together. There were several subject matters discussed, but Mel was not involved in all of them.

Karen did not participate in the Gilbert residence meeting or around the table. She was in the kitchen. She would bring in fruits, nuts and possibly candy from the kitchen. She was not happy about the meeting being there and he does not remember that Karen ever participated in any of the meetings. Mel testified further that Karen told Michael Gilbert in front of Mel that she "did not want these people in her house."

The court finds there is no evidence that anybody had dirty or muddy boots on in her house. The court finds that Karen Gilbert did not participate in the subject matter of the meetings, but she either knew what was going on or should have known under the doctrine of deliberate ignorance, similarly to drug couriers.

As to Karen Gilbert, Mel had a conversation with her near the end of the trial and she protested to him that Michael Gilbert was innocent. Mel reminded her of the meeting at their home and she responded to Mel, "Oh, yes. I forgot about that."

There was testimony about a large safe at the Gilbert residence that was large enough to hold the contents of the four new luggage cases Jack Kramer had with

---

**13.** Here, again, as to Mel Kessler's answers, the court made a note, "were too sure to be made up."

him when Mel went out with him on a private plane and Michael Gilbert met them at the airport—the intimation was that the luggage contents were cash bundles. Jack Kramer had two night cases and two over-nighters, but Mel never saw a safe nor was there a discussion of this safe. Apparently the safe was a large one, but not a walk-in safe.

Mel talked with Dale Lyon about the money flow from Liechtenstein to Tortola. One of the purposes of the meeting was to safeguard the money flow. Lyon's concern was bank thievery. Fainsbert was working on the loans from Troon to CGL and dis-tributed working copies.

The meeting lasted an hour or less. No one asked who Ben was or why he was there. Allsworth, Dale Lyon, and Jack Kramer thought the 15 percent income par-ticipation would survive paying off the mortgage. When construction service was at various levels of construction, and certi-fied by Dale Lyon, Lyon would request Murphy or Mel to get the construction draw.

The purpose of the Liechtenstein corpo-ration was to avoid the 20 percent with-holding tax imposed on offshore corpora-tions where U.S. citizens are involved. Tortola (British Virgin Islands) is one of two countries which has a treaty with the U.S. on the subject that takes it out of that requirement.

The Tortola corporation used code names for secrecy and Mel selected the code name of Martin Lewis; he used the names of Ben Kramer's sons. And that's interesting be-cause as he testified at trial, Martin wasn't born. But Mel knew what the name was going to be.

That was the code name needed to get information or access to information about Troon. Mel Kessler also gave the code name to Lyon.

The second Trident Center meeting came a day or two after the meeting with Hardie at the construction shack. Mel's testimony was that he really did not meet Hardie. They shook hands and that was it and he didn't consider it really meeting him. That may not dovetail with Hardie's recollection

that he never met Mel Kessler, but it does not entirely negate it.

At the second Trident Center meeting Dale Lyon picked Mel up and Dale wanted to do a trial run of money flowing from Liechtenstein to Tortola to LA. Fainsbert was also at the meeting.

Both Dale and Sam thought it would be a good idea to convert the money flow to a Dutch bank. Dale Lyon thought using a Dutch bank would better legitimize the money coming to CGL as a loan, but the Dutch bank wanted a two percent service charge and Ben said no.

The court finds that to be significant because that's the only time in the evidence that anyone—unless perhaps for Mr. Bass—stood up to Sam and told him: No, we aren't doing it that way. This indicates the power that Ben Kramer had—power because Sam, as well as apparently every-one else, knew it was Ben's money. When the checks came to Mel Kessler's office, Dolores, his secretary, sent them to Liecht-enstein. The first two were brought to the office by Jack Kramer and he gave Dolores details of how to transmit it.

As to the marina, Kessler testified Dale Lyon was frequently in Florida during the acquisition of the marina, probably twice a month, as those meetings were in Miami.

Ben and Dale were very friendly.

Mel asked Sam why Julie Coyne was in LCP. Sam said she was his mistress for several years and she brought in the bank-er, Jules Huppert; and Jules Huppert was used to wash the cash. Later in 1985, perhaps late summer, Sam told Mel that Julie was involved in money laundering.

There was a meeting at Sam Gilbert and Associates. Mel testified that all the de-fendants, including Sam, were there, plus Allsworth, Fainsbert and Kessler, Lyon, and Coyne, but Coyne was out in the secre-tarial area.

Fainsbert asked Mel Kessler and Michael Gilbert to step out of the office. Ben want-ed Coyne to assign her interest. Ben was hollering at Sam, "You better get that _____ bitch to sign the papers. My mon-

ey." Sam came out of his office beet-red in complexion with papers and accompanied by Fainsbert. Mel couldn't hear all of Sam's and Julie's words, but they were loud and Julie "spoke like Ben".

Mel stopped in the construction office once and Dale and Jack Kramer were there and Dale had a spread sheet and Mel saw it while making a phone call; it had accounting columns, money in the $15 to $17 million range; other projects listed were a $500,000 loan and $600,000 loan from a bank and 12–point–something million dollars to the club.

Mel also said Sam had become disenchanted with Dale, and did not trust him any more because he thought Dale either had or was about to have a nervous breakdown. So Mel called Dale and found out there was no problem with Dale's health; it was just an argument with Sam.

Anyway, Dale was relieved from the day-to-day operation of the club. After learning this, Mel said to Dale Lyon, "You've got your percentage. Why don't you leave and take the family on a round-the-world cruise?"

In January '85, or April '86, there was apparently concern about some missing money, viz., a half million that Dale, Jack and Sam thought was missing. They had called Biedermann and Dale to go over Murphy's books and other banking information.

As to the amortization schedules, Dr. Biedermann was concerned about having documents for a $20 million dollar loan, but getting correspondence relating to a $12 million-plus loan. So Dr. Biedermann asked Murphy for new documents; Mel talked with Sandra Murphy, an accountant in Troon's office, who talked with Dr. Biedermann. Then Mel called Sam and he said to call Dale or Fainsbert. Mel called both and got new documentation from Dale.

LART was developed originally to shield Lamborghini from liability on these parts to Apache. It developed into a conduit of $90,000 a month to Apache that represented the 15% kicker. Dale Lyon and Sam both promised Ben this minimal amount.

Mel called Dale and Ben was in the same office talking with Dale; Ben was in the background while Mel and Dale were talking about income participation. Mel could hear Ben say in Dale's presence, "I need $90,000 a month."

Jack Kramer wanted 15 percent of the gross and the California interests resisted it, saying it comes out of Gilberts' interest. This is unclear from the evidence and no finding can be made on the record.

In April of '86 a friend sent Mel Kessler a Tortola news clipping about Murphy's arrest. So Mel called Jack and discussed payments directly to Liechtenstein. Mel called Dale Lyon to tell him: "protect your ass"; Dale said he sent payments directly to Liechtenstein.

Three conversations of Mel's with Dale need to be reviewed here.

First, the lease for the marina was backdated to conform with payments to the marina, and Fainsbert and Allsworth backdated several documents just before foreclosure.

Mel had a conversation with Dale Lyon while they were by a California bank with red brick walls, but Mel can't identify it further. Dale Lyon told Mel he had destroyed the microfiche for most of the cashier's checks that were issued from cash, which corroborates Jack Kramer's testimony about this cover-up.

The third conversation followed Murphy's arrest and was about the foreclosure of the Kramers out of the marina. Dale and CGL were to run it. Dale and Allsworth were in the office and Mel walked in. Dale and Jack were having a heated discussion about foreclosure. Mel said it was a damage control discussion; that is, to give an appearance of legitimacy.

Mel had a conversation with Sam who said he and Dale would tell the Government agents they knew nothing about it and that Kessler had an offshore corporation to lend money to build the casino.

Attorneys for Cortrust wanted a letter from Mel to cover their backside. In 1986 or early 1987, Dale said they needed the letter about the authorization to pay Cor-

trust directly so they could pay off Jack and Ben Kramer who were pushing for the money. Mel told Dale, "No, I don't want to get more involved." At least one reason was Murphy had sent a letter dismissing Mel as attorney for Troon.

Not only Dale Lyon called him, but so did John Evans, who was once the head of the Strike Force here in the Southern District of Florida and a former partner of Michael Gilbert's attorney. Evans is now dead. Other people leaned on Mel to send this letter, too: Michael Gilbert and Jack Kramer. Mel, however, was out of it by then; he wasn't getting paid for anything. It's understandable why he refused.

Mel did not know who created the wire transfer indicating that M. Kessler authorized the nine and a half million dollar transfer. It was a copy of a wire transfer and was introduced at trial. At the trial Mel went through a great deal of dramatic testimony trying to explain away that M. Kessler wire. Of course, he was lying at the trial about that, but the court feels he's telling the truth at this point about that wire—that he didn't do it. There was a lot of discussion with Jack Kramer and John Evans about sending the nine and a half million. Jack Kramer asked him to send a wire, but Mel's adamant he did not do so nor did he know or consent to the one that was sent.

Mel called Dale and they talked and Mel told Lyon that Allsworth was handling the purchase of the lots for the marina.

The court found Mel Kessler's testimony to be credible, and that it corroborated much of what Jack Kramer testified to.

The court will make certain findings about the creation of the Gilbert family trusts, viz., that it would be imprudent for any trustee to invest money in a start-up business as they did the day after the creation of the trust. Even Crasnick, one of the co-trustees thought so.

As to Dale Lyon, it is obvious from the court's prior findings, Dale Lyon was in the money laundering operation almost from the "git-go" and involved up to his scalp, culpable and lied about it on the stand.

The evidence about Apache Marina is revealing as to the Bicycle Club, too. The marina and the related racing boat businesses were not only the Kramers' business "front" but also their consuming pastime and interest. Here again the Kramers carefully kept their names off documents as owners and here again the Gilberts and Dale Lyon pushed them out.

The Court finds that the real owners of the Bicycle Club were Ben Kramer, Randy Lanier, Tom, known as George Brock, and Tom's half-partner, Gene Fisher. Ben did not own it all. It was corroborated by the fact that Tom was there at the first meeting at the Pierre as well as the partners being in Zurich when the big check arrived. The Kramer interest was adequately described by Jack Kramer. It is significant that the trust with the money is BTR for Ben, Tom and Randy.

Ben Kramer's interest has been foreclosed by the jury's verdict.

This court specifically finds the owners of the Bicycle Club to be the drug partners: Ben, Tom and his partner, George, and Randy. The LCP partners and Gilberts, as well as Hardie associates were just "straw persons" for purposes of the licenses. Of course, George Hardie's group (Park Place Associates) was innocent of wrongdoing, as apparently are Michael Gilbert's siblings, Robert and Margaret, but the others (LCP and Michael Gilbert) were involved heavily, or knew or should have known of the illicit nature of the operation. Julie Coyne and possibly David Pierson, too, may well fall into the latter category; whether they fit into any of the categories or were duped by Sam, et al., are questions this court does not have to decide.

## CONCLUSIONS OF LAW

The first issue before this court is to determine the extent of the jury's verdict of forfeiture in this case. It is settled that a RICO forfeiture is an *in personam* forfeiture and not *in rem*. *United States v. Bissell*, 866 F.2d 1343 at 1348 n. 3 (11th Cir.1989); *United States v. Caporale*, 806 F.2d 1487, 1509 (11th Cir.1986), *cert. denied sub nom, Gopman v. United States,*

482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). If it were *in rem*, then the verdict would reach the entire property. However, the only property forfeitable at this time is that which belonged to the criminal defendants in this case whose interest in the Bell Gardens Bicycle Club (for convenience hereafter the Club) the jury forfeited under 18 U.S.C. § 1963(a)(3).

Congress enacted 18 U.S.C. § 1963(a)(3) as part of the Comprehensive Forfeiture Act of 1984 [14] to provide additional penalties and deterrents to persons convicted of RICO [15] offenses. Under this provision any person convicted of a RICO offense would forfeit any property "constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity" upon a jury verdict finding that the assets were derived from racketeering activities. RICO itself was designed and "intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983).

The outcome of the third-party claimants' claims in this ancillary proceeding is governed almost exclusively by 18 U.S.C. § 1963(*l*). Under that provision third parties to the criminal proceeding may petition the court for relief from forfeiture of property belonging to a defendant. The statute sets forth two circumstances in which a claimant may recover forfeited property. First, a claimant can prevail if it demonstrates that legal interest was vested in the claimant and not the defendant prior to the commission of the acts giving rise to the forfeiture or that its title was superior to the defendant's interest. 18 U.S.C. § 1963(*l*)(6)(A).[16] Secondly, if a claimant's legal interest vested after commission of the acts giving rise to forfeiture, the claimant may recover the forfeited property upon a showing that he/she was a bona fide purchaser for value with no reason to believe the property was subject to forfeiture. 18 U.S.C. § 1963(*l*)(6)(B). *See* n. 16. *See also* 1984 U.S.Code Cong. and Adm. News, pp. 3182, 3392. Congress has also adopted this procedure in another forfeiture statute.[17]

The claimants must show, by a preponderance of the evidence, they have a statutory right to the property subject to the forfeiture order. Upon a showing of a right to the property by a preponderance of the evidence, the government then is afforded an opportunity to rebut that showing of rights in the property. Thus it is clear that Congress intended to allow retention of forfeited properties by third parties in three instances: one, by virtue of title being vested in the claimant and not the defendant; two, by claimant's holding superior title; or three, by claimant's purchasing an interest without reasonable cause to know of the tainted nature of the property.

The third defense concerning lack of reasonable cause to know of the forfeitability of the property is, to this court's thinking, simply the standard that claimant neither knew nor should have known. Sticking one's head in the sand, a/k/a the ostrich defense, or as often articulated in

---

**14.** *See* Pub.L. No. 98–473, 98 Stat.2040 (1984).

**15.** RICO is an acronym for the Racketeer Influenced and Corrupt Organizations Act of 1970.

**16.** 18 U.S.C. § 1963(*l*)(6) reads as follows:

If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

**17.** 18 U.S.C. § 1963(*l*), a Federal RICO statute, is virtually identical to 21 U.S.C. § 853(n)(6)(B), a Continuing Criminal Enterprise statute.

this circuit as deliberate ignorance,[18] is not available to save a petitioner from dismissal of its claim to forfeited property. Neither can a person have a vested interest in property if he is found to be acting as a nominee[19] for persons whose property is subject to forfeiture. *Braxton v. United States,* 858 F.2d 650 at 652–53 (11th Cir. 1988).

There are four third-party claimants or petitioners presently before this court. Each claim will be taken separately beginning with the claim of M. Dale Lyon.

## THE CLAIM OF M. DALE LYON

Mr. Lyon asserts both statutory defenses in his claim to forfeited properties. That is, that his interest in the property was vested in him rather than any defendant and that he had a superior right, title or interest to any forfeited right, title or interest held by a defendant in the underlying criminal trial. Lyon also asserts that some of his interest[20] arose because he was a bona fide purchaser for value without reasonable cause to know of the forfeitable nature of the Club. For the reasons stated below both Lyon's defenses must fail, at least in part.

■■■■ This court will first address Lyon's claim to superior title. Pursuant to the jury verdict of forfeiture rendered on April 3, 1990, title to the defendants' interest in the Club vested in the government at the time of the commission of the acts giving rise to the forfeitable nature of the assets. 18 U.S.C. § 1963(*l*)(6)(A). This is known as the relation back doctrine. *United States v. Bissell,* 866 F.2d 1343 (11th Cir.1989). The government asserts that title to the Club vested in the United States when Ben Kramer[21] made his money from smuggling marijuana into the United States. This court is not necessarily persuaded by this argument because the acts giving rise to the RICO indictment whereby the property became forfeitable would seem to be the money laundering scheme, not the importation of marijuana, although the importation was certainly an element of the scheme. However, it is of no moment because even if this court accepted the government's timetable, the statutory forfeiture reaches only that portion of the Club in which a defendant owned an interest. *See Bissell,* 866 F.2d 1343 at 1348 n. 3 (11th Cir.1989); *Caporale,* 806 F.2d 1487, 1509 (11th Cir.1986). Although this court finds that Lyon was involved from the beginning of the scheme to launder the money of Ben Kramer and his partners, the government has not proved that *all* of Lyon's purported interest was held by any defendant[22] whose interest was forfeited.

■■■■ The beginning of the money laundering scheme in this case began in September of 1983 at the meeting between Jack Kramer, Ben Kramer, and George Brock at the Pierre Hotel in New York City. It was then that the decision was made by Ben Kramer and his partners to

---

**18.** The Eleventh Circuit Court of Appeals does not allow deliberate ignorance as a defense to the "knowingly" element of a crime and a pattern jury instruction to that effect has been promulgated. *See* Eleventh Circuit Court of Appeal Pattern Instructions, Special Instruction 15, Deliberate Ignorance. *See also United States v. Howard,* 895 F.2d 722, 724 (11th Cir.1990); *United States v. Alvarez,* 837 F.2d 1024, 1028 (11th Cir.1988).

**19.** [nominee] "connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in, or ownership of, the rights of the person nominating him." *Braxton v. U.S.,* 858 F.2d 650 at 653 n. 6.

**20.** At Sam Gilbert's direction, 5% of the original 30% LCP holdings allocated to Lyon was sold to

Richard Traweek in December of 1985 in exchange for Traweek's arranging a 3.6 million dollar loan. This interest was repurchased by Lyon in late 1987.

**21.** Ben Kramer was the lead defendant in the criminal case which gave rise to this ancillary proceeding. The jury found any interest held by Ben Kramer in the Bicycle Club was forfeitable.

**22.** By this court's findings, of the defendants, only Ben Kramer and Michael Gilbert actually owned a forfeitable interest in the Club. Any interest held by Defendant Jack Kramer was through his son Ben. As his testimony confirmed, he acted as an agent of sorts for Ben and protected his various interests.

invest their laundered drug money into the Club.

Documentation of Lyon's asserted ownership interest in the Club was executed on December 5, 1983 although the LCP partnership concept was conceived and agreed to by the name partners in October of 1983. This time frame fits nicely with the initial meetings between Sam Gilbert and Jack Kramer regarding the use of LCP as a front. It is this court's conclusion that, at the time of the initial agreements for funding the Club with BTR monies, LCP was a nominee for BTR Trust investments.[23] Therefore, as a first step, it must be determined what ownership interest was held by Ben Kramer at that time in the Trust. There is no documentation evidencing an ownership interest by Ben Kramer in the Club. This is not surprising inasmuch as Ben Kramer, because of his record, could not be disclosed as a record owner of the Club.[24] Plus, it was part of the coverup of the money laundering to avoid any appearance of the Kramer interests. Whatever interest Ben Kramer had at that time precludes Lyon, under the relation back doctrine, from asserting either that title was vested in him rather than the Defendant Ben Kramer or that he was a title holder superior to Ben Kramer's interest. The court bases this conclusion on the fact that Lyon was merely a nominee holder of the title to the Club through LCP at the inception of the project.

Since the BTR trust was a partnership among four individuals, each partnership interest contributing approximately four million dollars towards the Club, it is the conclusion of this court that Ben Kramer held a one-third ($\frac{1}{3}$) ownership interest in LCP at the time of the commission of the acts giving rise to the forfeitability of the property. This court hereby denies Lyon's petition in the amount of one third ($\frac{1}{3}$) of his current holdings in LCP. This interest extends to his original 30% holding and thus reaches the Lyon Children's Trust holdings as well as his holdings individually.[25]

Lyon's other statutory defense, that he was a bona fide purchaser for value without reasonable cause to know of the forfeitable nature of the Club, requires little or no attention by this court following this court's findings of fact. Lyon's testimony at trial and the ancillary proceedings[26] as well as other testimony developed at the ancillary proceedings made it clear that Lyon had not only knowledge but was actively involved in this scheme of using laundered drug smuggling funds.

Until the testimony of the Government's last two star witnesses, Jack Kramer and Mel Kessler[27], the court was of the

---

**23.** Although this court finds that Ben Kramer's interest in the Club changed following the arrest of Shaun Murphy and the pay-off of the Troon Loan, in the beginning the BTR Trust was the true investing owner in the Club. It is here that the relation back doctrine comes strongly into play to capture the original interest held by Ben Kramer through the BTR Trust.

**24.** Ben Kramer was first convicted of marijuana smuggling in 1978, served time and was on probation during his large scale smuggling operations with Lanier, Brock and Fisher.

**25.** The government settled with Lyon's wife Maureen and her interest is not subject to this court's conclusions.

**26.** Lyon testified at trial under a grant of immunity and it has always been this court's belief from that testimony that Lyon at least had an inkling of what was happening. This court was surprised that Lyon was not indicted in this case along with the other defendants. Lyon was loathe to recall many details of the whys and

wherefores of various transactions during his testimony at the ancillary proceedings and this weighed heavily against his credibility. Any person with Lyon's background and obvious intelligence would be able to recall the significance of many, or at least some, of the Government's exhibits about which he was questioned. As a result, this court gives little credence to Lyon's testimony and finds much of it, at the minimum, incredible.

**27.** Both these witnesses were defendants in the criminal phase of this proceeding and it was Mr. Kramer and his son Ben's interest which the jury found forfeitable to the extent that they owned a portion of the Club. At the time of the criminal trial and subsequent forfeiture proceedings, both of the Kramers, through argument of counsel, denied any interest in the Club until Jack Kramer finally testified.

The reasons for the Kramers' stance as to their ownership in the Club became more clear through evidence received during these ancillary proceedings. In the beginning the Kramers

strained belief that perhaps, in the very beginning of the scheme, Lyon was without reasonable cause to believe that the Club funds were tainted money subject to forfeiture. It was their testimony that finally placed the pieces of the puzzle into a more coherent and believable picture. Even if only a fraction of those witnesses' testimony is to be believed, then it is obvious to this court that Lyon was heavily involved in the money laundering enterprise from its inception. And, this court found Jack Kramer and Mel Kessler's testimony to be very credible.

It is this court's finding that Lyon not only knew of the scheme or idea that the Club would be built with money laundered from drug proceeds of Ben Kramer and his associates, but helped develop and carry out the plan. His petition for relief as a bona fide purchaser of the 5% LCP interest purchased from Richard Traweek is hereby denied in its entirety. *See* fn. 20.

■ Lyon asserts that even if this court denies his claim he is entitled to retain that part of his interest of the Club derived from his efforts and business decisions. As noted above, the Club was built at a cost of approximately $22 million dollars of which $12 million came from Kramer monies through Troon, or 54% of the financing. Lyon asserts that the phenomenal success of the Club[28] is a direct result of his business and management decisions and that portion of his interest in the Club was not derived from racketeering activities and therefore not forfeitable.

■ Although the statute is silent as to whether that portion of a claimant's interest is forfeitable, case law as to a defendant's property subject to forfeiture, either under RICO or CCE statutes, is helpful by analogy. In *United States v. Porcelli*, 865

F.2d 1352 (2d Cir.1989) the court remanded the case for a determination of the proportion of assets to be forfeited under 18 U.S.C. § 1963(a)(2)(D) using the rule of proportionality enunciated in *United States v. McKeithen*, 822 F.2d 310 (2d Cir.1987). *See also United States v. Zang*, 703 F.2d 1186 (10th Cir.1982) (remanded to establish terms and conditions of forfeiture.) Although these cases possess persuasive qualities, this court declines to apply the rule in this case for the following reasons. First, all the cases cited by Lyon in support of his proportionality argument deal with a provision of § 1963 other than (a)(3) or else deal with entities originally created by legitimate funds and later infused with tainted monies forfeitable under the statute. An entity developed from legitimate funds and later infused with tainted capital is not an entity "derived" from illgotten gains under the § 1963(a)(3).

Such is not the case here since from its inception the Club was built on "dirty money". Only cost overruns and underestimates prevented its being exclusively "dirty money". Any loan or advantage later achieved by the Club through individual efforts would not have been possible but for the original funding which got the Club started. Thus any success later achieved by the Club were proceeds or derived from the original tainted funds under the statute[29] and Lyon's efforts cannot save that portion of his interest found by this court to have been originally held by Ben Kramer.

Secondly, the Eleventh Circuit has yet to speak directly on this issue although it did touch upon the concept in dictum in *United States v. Real Property and Residence*, 921 F.2d 1551 (11th Cir.1991), a case addressing *in rem* forfeiture under 21 U.S.C.

---

were a driving force in the procurement of the necessary funds needed to build the Club and expected in return to receive a portion of the proceeds as owners of the Club.

However, as the Government began to close the net around this complex money laundering scheme, it became clear to the other members of the scheme that not only should the Kramers be denied any ownership interest in the Club, but also their "loans" should be retired as soon

as possible in an attempt to remove the taint of laundered money from the highly successful Club. As stated by Jack Kramer during his testimony to this court "the Devil lifted his head ... greed motivated the ... [decision]"

**28.** The current value of the Club is between 100 and 150 million dollars.

**29.** *See* 18 U.S.C. § 1963(a), (*l*)(3).

§ 881(a)(7). Because there is no binding precedent in this Circuit mandating the application of the doctrine of proportionality, this court declines application under the evidence in this case. Given the fact that Lyon was heavily involved in this money laundering scheme from its inception, his retention of two-thirds of his LCP holdings (i.e., the interest funded and owned by Ben Kramer's partners) is compensation enough, yea far too much, for whatever his business management and acumen contributed, if any, to the Club.

## THE CLAIM OF THE LYON CHILDREN'S TRUST

■ The court turns next to the claim of the Lyon Children Trust. The uncontroverted testimony of M. Dale Lyon establishes beyond doubt that the Corpus of the trust was a gift by Lyon in 1986. This assertion alone dooms the Trust because there is no way a superior title could have vested and also no way the Trust could be construed as a bona fide purchaser for value since no consideration passed. It was a gift pure and simple. Therefore, the petition for relief by the Lyon Children Trust is denied to the same extent as that of its settlor M. Dale Lyon and thus one third (⅓) of the trust must revert to the United States as Ben Kramer's ownership interest forfeited by the jury.

## THE CLAIM OF KAREN GILBERT

■ The claims of Karen Gilbert and the Michael Gilbert Irrevocable Family Trust raise different issues for consideration. Karen Gilbert is claiming her interest in the Club as a bona fide purchaser without knowledge. She asserts that through the community property laws of California her interest vested in the Club at the time Michael Gilbert's LCP shares were purchased with the loan monies from Olympic National Bank.

Although this argument is not without merit, it cannot carry the day because this court received evidence that as early as November of 1983, meetings were held in the home of Karen and Michael Gilbert concerning the Club. In attendance at those meetings were Ben and Jack Kramer. Mrs. Gilbert testified at the ancillary proceeding that her only meetings with Jack Kramer were at a Thanksgiving time dinner and that she had never met Ben Kramer until much later. Her husband also testified that neither of them knew anything about a money laundering scheme. This testimony was directly controverted by the testimony of both Mel Kessler and Jack Kramer.[30]

As noted, Jack Kramer and Melvyn Kessler's testimony must be scrutinized closely. However, they corroborated each other as to certain meetings and the details of those meetings held at Michael Gilbert's home. While this court has specifically found that Mrs. Gilbert did not participate in the discussions at a meeting and is not a culpable party to the money laundering scheme, it is this court's opinion that Mrs. Gilbert knew, or at least should have known of the tainted nature of her husband's interest. Deliberate ignorance is not available to Mrs. Gilbert in support of her petition under either the statute or the law of this Circuit. She cannot have been a bona fide purchaser for value without reasonable cause to know of the forfeitable nature of that half of her husband's interest to which she took title. Therefore, her petition for relief must be denied.

■ This court also has trouble with allowing the California community property laws to pass Mrs. Gilbert an interest in her husband's forfeited property. This

---

**30.** The court compliments Michael Gilbert on his sterling performance at trial which led the jury to recommend leniency at his sentencing. This court followed the jury's recommendation at sentencing but, in light of these ancillary proceedings, would disregard that recommendation if given an opportunity to resentence Michael Gilbert. Clearly, the sentence given him of four years imprisonment (pre-guidelines), a $350,000.00 committed fine and five years probation was improvidently low. If the jury had heard the evidence in the ancillary proceeding, it undoubtedly would not have made such a recommendation. The confinement portion alone of the other defendants, who had no such recommendation of the jury was as follows: Ben Kramer—45 years; Attorney Mel Kessler—30 years; and Jack Kramer—19 years.

court is aware of the holdings of *U.S. v. One Single Family Residence*, 894 F.2d 1511 (11th Cir.1990) and *U.S. v. Certain Real Property at 2525 Leroy Lane*, 910 F.2d 343 (6th Cir.1990) where state property laws defined the interest holdings of innocent spouses in federal forfeiture proceedings. It is, to this court's thinking, a violation of Equal Protection under the law to allow similarly situated individuals, i.e. spouses of convicted RICO violators, to be treated differently merely because they reside in an area where state law gives them a half interest in all community property at the moment of its acquisition. A person in a common law or non-community property state would be afforded different treatment under Federal RICO Forfeiture Law. While this court's holding that Mrs. Gilbert certainly had reasonable cause to know of the tainted nature of her husband's interest from which her interest arose moots a discussion in this area, this court merely notes that a use of state property law in this limited circumstance would not allow for a uniform application of federal law between citizens of different states.

## THE CLAIM OF THE MICHAEL GILBERT IRREVOCABLE FAMILY TRUST

 The Michael Gilbert Irrevocable Family trust presents a similar situation as the Lyon Children Trust but with a twist. Here is a fiction that loan money from Olympic National Bank was used to fund the purchase by the trust of an interest offered to Michael Gilbert. The Trust then, through its trustees, is thus a bona fide purchaser for value without reasonable cause to believe the property is subject to forfeiture. This argument must fail on two grounds.

One: The purported corpus of the trust was in reality not loan monies, but rather a portion of Michael Gilbert's interest in the Club. There had to have been a directive from Michael Gilbert, the settlor, to the Trustees to invest in the Club. As Robert Gilbert candidly testified, everyone knew it was to be done and the co-trustees were the same in both trusts. If this investment was not made at the direction of the settlor

at the time of the creation of the corpus, then the Trustees would have breached the Trust document by making a speculative investment with *all* the trust funds. At the time of the purported purchase, it is evident that the Club was faced with severe financial problems as encountered by many start up businesses. The reality of the transaction is that the corpus of the trust was a portion of Michael Gilbert's shares in LCP, especially since the loan was to be repaid from LCP earnings.

Second: The evidence received showed that the purchasing agent for the trust was Steve Fainsbert who purchased the interest without the knowledge or consent of his co-trustee, Donald Crasnick, or so Crasnick testified. Be that as it may, even if the trust was a bona fide purchaser for value, Steve Fainsbert, co-trustee and attorney at law, obviously had strong cause to believe the Club was funded, at least in part, by laundered drug money and thus forfeitable. It is clear from the evidence in this case that Fainsbert was an active participant in the formation and execution of the money laundering scheme. He prepared many of the documents which were necessary to legitimize the money laundering transactions and aided in the "damage control" portion of the scheme following the arrest of Shaun Murphy, agent for Troon Mortgage Investment, Inc. in Tortola, B.V.I.

It should be again noted that LCP, not Michael Gilbert, made the interest payments on the two hundred thousand dollar loan from Olympic Bank. Very little (about one quarter) had been paid on the principal until Shaun Murphy's arrest and then suddenly, the entire loan was paid off in full.

For either of the above reasons, the petition for relief from this court's forfeiture order by the Michael Gilbert Irrevocable Family Trust must fail and that petition for relief is hereby DENIED.

## THE CLAIM OF CHRISTINE KRAMER

 Remaining before the court in these ancillary proceedings is a claim by Christine Angela Reagan Kramer, the for-

 

mer wife of Defendant Ben Kramer. She is claiming on behalf of herself and the children of the marriage an equitable distribution of marital assets belonging to Ben Kramer subject to forfeiture under the marriage laws of Florida. This court, having rejected the claim of Karen Gilbert, now rejects this claim also. There is no presumption in the law of equitable distribution that a spouse's interest in marital property arises at the moment the property is obtained. That being the case, under the relation back doctrine Ben Kramer's interest in the Club was forfeited, by statute, at the time the decision was made to invest in the Club which was around September of 1983. Therefore, at the time of the divorce of Christine Kramer from Ben Kramer in 1988, Ben Kramer had no interest in the Club that was subject to equitable distribution and Christine Kramer's petition must also be DENIED.

### CONCLUSION

The petition for relief by M. Dale Lyon is hereby GRANTED in part and DENIED in part. Since the government has proved to this court, by more than a preponderance of the evidence, that Lyon was a nominee holder for the BTR Trust at the beginning of this venture, then title was not vested in Lyon nor was his interest in the Club superior. However, the government also proved that Defendant Ben Kramer owned only one third of that trust and thus due to the *in personam* nature of RICO forfeiture, one third of Lyon's current interest in the Club is all that is forfeitable at this time. This holding applies equally to The Lyon Children Trust.

As to the petition for relief of Karen Gilbert and the Michael Gilbert Family Irrevocable Trust, those petitions are hereby DENIED for the reasons stated above.

Lastly, Christine Kramer's petition for relief from forfeiture is also hereby DENIED for the reasons stated above.

This court reserves the right to make modifications as to form for purposes of clarity in the event of an appeal to the Eleventh Circuit Court of Appeals and may

make substantive changes upon motion by a party.

DONE AND ORDERED.