UNITED STATES of America, Plaintiff,

v.

**Benjamin Barry KRAMER, et al., Defendants.**

No. 87–879–CR.

United States District Court, S.D. Florida.

March 20, 1997.

**224**

James H. Swain, Asst. U.S. Atty., Office of U.S. Attorney, Miami, FL, for Plaintiff.

Girardi and Keese, Los Angeles, CA, Larry S. Stewart, Stewart, Tilghman, Fox & Bianchi, Miami, FL, for Claimant Julie Coyne.

Harvey W. Gurland, Jr., Eckert, Seamans, Cherin & Mellott, Miami, FL, James R. Asperger, Mark C. Holscher, Judith A. Heinz, Los Angeles, CA, for Ladbroke Racing Corp.

### AMENDED ORDER

ROETTGER, Chief Judge.

**THIS CAUSE** is before the Court on request of the government for confirmation of the sale of its interest in the Bell Gardens Bicycle Club ("Bicycle Club").

The government acquired its interest in the Bicycle Club pursuant to 18 U.S.C. § 1963 as a result of the conviction of Benjamin Barry Kramer and Michael Gilbert for violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"). The Bicycle Club is operated by a joint venture between Park Place Associates, Ltd. ("PPA") and LCP Associates, Ltd. ("LCP"). At the conclusion of ancillary forfeiture proceedings in this matter, the court determined that LCP was a mere nominee for BTR, a partnership between Benjamin Barry Kramer, Randy Thomas Lanier, George Paul Brock and Eugene Albert Fischer and that Kramer and his associates established the Bicycle Club for purposes of money laundering. *United States v. Kramer,* 807 F.Supp. 707 (S.D.Fla.1991).

Although the Eleventh Circuit Court of Appeals affirmed Michael Gilbert's conviction, it set aside the forfeiture of Michael Gilbert's interests and those derived from him as the racketeering acts which gave rise to his RICO conviction occurred after Michael Gilbert had acquired his interest in the Bicycle Club. *United States v. Kramer,* 73 F.3d 1067, 1076 (11th Cir.1996). In light of the differing ownership interests, the Court of Appeals remanded the matter to this court for hearings and additional orders regarding the Bicycle Club's operations. *Id.* at 1076 n. 23.

Disposition of the government's interest has been the subject of several hearings and multiple orders of the court since the issuing of the mandate by the Eleventh Circuit on January 16, 1996. One of the obstacles to the sale of the government's interest is the assertion by Julie Coyne of the existence of a right of first refusal, that is a right under the limited partnership agreement by LCP and by its individual limited partners to purchase the government's interest in LCP on the same terms and conditions as a prospective buyer.

The government has entered into a merger agreement with Ladbroke Racing Corporation ("Ladbroke") for the sale of its interest. Although the merger was opposed initially by PPA and certain limited partners of LCP, all

parties except Julie Coyne now agree that the merger with Ladbroke is in the best interest of all concerned.

18 U.S.C. § 1963(f) provides "... nor shall the defendant or any person acting in concert with ... the defendant be eligible to purchase forfeited property at any sale held by the United States." According to Ms. Coyne, she qualifies to participate in the sale under this subsection as she has never been indicted or convicted by a jury for her participation in the operation of the Bicycle Club.

Julie Coyne contests this court's jurisdiction as the statute vests authority for the disposition of the property in the Attorney General. This court readily agrees it has very limited jurisdiction at this stage of this proceeding. However, this court clearly has jurisdiction under 18 U.S.C.1963(f) to determine if Ladbroke[1] or Julie Coyne is barred from being a purchaser. There is no evidence before the court with even the slightest suggestion that Ladbroke "acted in concert with" the convicted defendants in the instant case.

■ The same does not hold true for Julie Coyne. There is ample evidence concerning her activities in the founding and operation of this money-laundering entity known as the Bicycle Club to conclude that she had knowledge of the illegal activities. There are numerous findings in this court's opinion set forth over thirty-eight pages establishing that Julie Coyne acted in concert with defendants. *See United States v. Kramer*, 807 F.Supp. 707 (S.D.Fla.1991). The Eleventh Circuit affirmed the convictions of all defendants and did not disturb any of the court's findings other than the forfeiture related to Michael Gilbert.[2] *Kramer*, 73 F.3d at 1076.

This court invites attention to the findings specifically referencing Julie Coyne's actions in concert with the convicted defendants. *Kramer*, 807 F.Supp. at 712 *et seq.*

Additionally, there is a whole section of the court's opinion on Julie Coyne and her involvement in the origins and operation of the Bicycle Club. *Id.* at 716–719. Finally, there is the additional damning evidence by defendant Mel Kessler about Julie Coyne's participation in a meeting at Sam Gilbert's offices. *Id.* at 734–735. For ready reference the portions referred to in the preceding two paragraphs are set forth in footnote form.[3]

1. There is an additional "wannabe" purchaser of the Bicycle Club, the Bicycle Club Acquisition Co., who has surfaced in recent weeks. It asserts that it is in a better position to purchase the government's interest as it can be licensed in California while Ladbroke cannot. Ladbroke's status with the California Gaming Commission is not a matter within this court's jurisdiction.

2. It should be pointed out that, although Dale Lyon was not indicted in the instant case, both he, Steven Fainsbert, Emerson Allsworth and Michael Gilbert were indicted in a case assigned to Judge Moreno of this District for their activities in connection with the Bicycle Club's origin. Emerson Allsworth and Dale Lyon pleaded guilty in Judge Moreno's case. After trial, Michael Gilbert was found guilty and Steven Fainsbert was aqcuitted.

3. *Kramer* 807 F.Supp. at 712.... In September of 1983, Ben and Jack Kramer met with George Brock (Tom), at the Hotel Pierre in New York City, where they discussed the money laundering operation. In October, 1983, Lyon and Coyne are brought into LCP by Sam Gilbert. Ostensibly, Sam Gilbert released his 60% of LCP to them for little or no consideration—at least that's the way it appears from the evidence albeit most strangely out of character for Sam, considering every description that came out about Sam Gilbert in the five-plus months of trial and ancillary hearing. Coyne testified her 30% cost $1,000., but did not indicate to whom it was paid.

Pierson was told by Sam that all he wanted was to build the building with his construction company and to get the operation going and they would need someone with the banking and business experience of Dale Lyon and the personnel background of Julieann Coyne.

Whether the fact that Sam Gilbert and Julie Coyne had a romantic relationship for several years had anything to do with it is, of course, speculative. In any event, that relationship had broken off about a year earlier and, presumably, it had nothing to do with it as that was the month she became married.

On October 21, 1983, the court finds there was another meeting at the Pierre. At that meeting were Dale Lyon, Mel Kessler, Ben Kramer and Sam Gilbert. There was a discussion about the Bell Gardens Bicycle Club.

In October, 1983, CGL was a holding corporation in California whose principals were Julie Coyne, Sam Gilbert and Dale Lyon. Dale Lyon was the President. Julie Coyne was the Chief Financial Officer, but Sam Gilbert ran the show even though he had only 20% of the stock. The remainder was split between Coyne and Lyon. Coyne paid $3,000 for her interest.

There was a meeting at L'Ermitage Hotel in Beverly Hills on November 17, 1983. Jack

Kramer met with Sam Gilbert about the laundering scheme. Government agents there had the building under surveillance, but not apparently as to this venture.

In any event, on a piece of yellow tablet paper Sam Gilbert scrawled a number of things. (Govt. Exhibit 183); the exhibit was recovered by the agents from the trash.

On the upper left-hand corner it says Capital L period, account abbreviated. Underneath it Liechtenstein, spelled incorrectly as Lichtenstein. To the right of that in the upper right-hand corner it says NV Corp. Under that Tortola. Then a line from Tortola to a line that says Investment Trust. The next line says Employee: Dale Lyon. A line is skipped and then there is another sub-topic for Owner Group. Listed under the owners group, Hardie, misspelled, Dale Lyon, underlined, also misspelled as Lyons rather than Lyon; David Pierson and lastly, Julie. Those are the four principals in LCP and Park Place Associates; at that time they were the general partners in the two groups, but not overlapping general partners.

The meeting was fairly short on the evening of the 17th. Jack Kramer revealed the contents of the conversation to be a discussion between him and Sam as to the money flow, which is reflected on Government's Exhibit 182. The next morning Sam prepared the chart (Govt.Ex. 183) and, referring to Hardie, Lyon, Pierson and Coyne, said: "these are your straw people. These are lily-white people who will be approved by the Gambling Commission:" These are "the names."

p. 716.... Julianne Coyne is a bright, talented, tough, very attractive lady. Her timing was pretty good. She started off with the Bank of America, then the Crocker Bank and in September of 1976, she interviewed with Imperial Bank as Director of Personnel and Dale Lyon was there as Administrative or Executive Vice President. The bank had only 200 employees but had grown to 800 employees when she left in February of 1980 and she had done various things, including affirmative action plans and so forth. She described Lyon as the third or fourth most responsible person in the bank. She became a personnel consultant for smaller banks for head-hunting and to work on affirmative action programs, compensation programs, personnel programs and with their training programs, etc., and was grossing $250,000. to $400,000. a year.

She met Sam Gilbert in 1977 and from April, 1978 to mid–1982 she and Sam Gilbert were lovers. She spent a considerable amount of time with him which translated to five or six days a week with trips to Europe and elsewhere overseas. She described him in various ways during her testimony: e.g., one strong personality, that he was inventive because they had a business together (Fivel) developing shock absorbing athletic shoes, and he dabbled with ideas for magnetic door closers, curtain rods, etc. When she was in Fivel Corporation jointly with Sam, she put no money into it. It all came from Sam. Sam never told her he was a money launderer. After the relationship was over, she and Sam

remained friends but mostly it was a business relationship.

She hired Pierson's law firm to represent Imperial Bank in affirmative action matters. She knew Pierson in the early 80s because she hired their key executives. She first became aware of the Bicycle Club venture in a call from Pierson to get prospects. She took the idea to Sam on the basis he might want to build a casino and invest in it, and Sam's response was that building it is fine, but he didn't know about investing in it. He suggested she take it to a banker and get it evaluated.

So Julie suggested Lyon and Sam agreed. They had used Lyon before in the shoe business, Fivel. Sam was interested.

Subsequently, after discussion about the Bicycle Club early on, she buttonholed Sam and said that Dale and David have a piece of this Bicycle Club business and you have the construction contract. She felt she needed a finder's fee.

Sam responded: "you do, but it's a start-up business and it can't afford it. Why not take a percentage?" She didn't like the risk of it, and was a bit anxious about that, but she agreed to do that. She paid $1,000. for her thirty percent.

Because she decided it was time in her life to get married and start a family, Julie broke off the romantic relationship in 1982 and Sam was furious. In 1979 or 1980, she had bought a condo worth $110,000. and Sam had given her $50,000. to put down on it. She made the payments on the remaining balance of $60,000. but when they broke up, Sam insisted on her giving him a quitclaim deed to the condo. She also expressed very strong feelings against Sam. There was an exclamation later on during her testimony: she "would never forgive him for getting her into all this!" She went no further with that nor were there any questions about it.

Sam told her he did go to the New York Teachers Credit Union because he had gotten credit from them before. Sam advised her he had arranged financing for the Bicycle Club. She was relieved because that was LCP's job for Bicycle Club venture.

In November, 1983, the name Troon Mortgage came up. Sam said he was unable to get the New York Teachers Credit Union loan, so he arranged it through Troon Mortgage, and that it was an offshore trust. She was not concerned because Sam had guaranteed it and he wouldn't have done that if he didn't think it was a good loan and one that could be paid back.

She identified the handwriting on Exhibit 183, the note picked up at the L'Ermitage, as definitely being Sam's on the top half and the numbers on the bottom half appeared to be Sam Gilbert's. She couldn't say as to the printing on Exhibit 182, as to money flow.

As to CGL, Sam did not want David Pierson in CGL as Pierson was involved in two start-up businesses, Olympic Bank and the Bicycle Club. Sam acted as both president of CGL, Lyon's title, and its chief financial officer, her title, and she

testified she did not know that CGL was a conduit for the Kramers' drug money. Sam did not have signature authority on the checkbook for CGL although he ran it. She and Dale Lyon had signature authorization so they could sign individually below $10,000.

Julie began to be dissatisfied in May or June of 1985 when she realized Sam had lied to her about buying land in Florida. She told him she did not want any part of development of any property outside California. He had gotten her to sign an authorization to negotiate for CGL in Florida, apparently on some other basis.

When she caught Sam lying to her about CGL's involvement with Florida real estate and the development of the marina, she said she wanted more facts before going to certain conflict and a hassle with Sam. She went to Dale Lyon. However, she did not get a satisfactory explanation from Dale Lyon about the marina.

She then confronted Sam about it and told him that he had lied to her. Sam became very angry and suggested if she didn't like it or was uncomfortable, she should resign. Consequently, she did so and her letter of resignation was filed on June 28, 1985; when she resigned, she turned over 3,000 shares of CGL's stock, that she paid $3,000 for, to CGL as well.

Much testimony then ensued about Julie becoming a limited partner. She got married on November 4, 1983 at the beginning of LCP and had a child after "a bad pregnancy". After several months she wanted to become a limited partner. She stated she stopped attending CGL meetings in June of 1986 because she felt she was less and less needed and she was pregnant with her second child and had lost one a few months previously.

Sanwa Bank would not give them the loan they needed in late 1983 unless (1) the CGL loan was subordinated and, (2) it received a personal guarantee by a substantial person, e.g., Sam Gilbert. Sam balked on both. Sam suggested that if LCP could give twenty percent to the Gilbert family, the family would sign the guarantee, held subordinate the CGL loan and get a $5 million loan. So she was willing to give up 10% and asked Pierson to give up 10%.

The Bicycle Club opened at the end of November, 1984. She further testified that at first the club lost a million dollars, but between January and February 1985 it began to show a profit and thereafter made distributions.

The first distribution was $10,000 and then the next one quickly rose to $30,000, to $50,000, then $70,000 monthly, and eventually to $234,-000 monthly.

She testified she used 100% of the distributions for herself and her family, and none went to Sam Gilbert or the Kramers.

She was impressed with Dale Lyon because she had watched Dale go through the debit items from May 1986 (shortly after Shaun Murphy's arrest) to December, 1987. The court doesn't think Julie realized when she testified that Dale was sweeping the trail clear of evidence.

She had seen Jack Kramer in Sam Gilbert's office two or three times. There was nothing remarkable about the meetings and Sam had introduced Jack Kramer as an electrical contractor who had been doing work in the building.

She thought the information about the $200,-000. purchase price for the Gilberts' interest came from an attorney and tax consultant, but that she never got any of the money and Sam said it was paid.

Sam wanted CGL to develop projects so he could keep his construction crew occupied.

Ms. Coyne testified further she did not participate in CGL's last Troon loan and did not know of the memorandum of loan agreement of 1983 until her deposition in July of 1990. That was similarly so for the loan agreement. She testified she never ever talked with anyone about Troon. The loan from Troon to CGL does not contain the 15% kicker, but the one from CGL to LCP did and she can't explain that.

She met with and talked with Lyon one or two times between January and July of 1986 and talked with similar frequency to David Pierson.

In March of 1989 she wrote an irate letter about George Hardie because he had been elected mayor of a town 100 miles from the club but was still running the day-to-day operation there. She criticized Hardie for a bad extension of credit which added a million dollars to the accounts receivable.

A month later after she wrote the poison pen letter to Dale Lyon about George Hardie, Julie was locked out of the locker room in the sense she stopped receiving monthly reports which the agreement entitled her to receive. When Hardie stopped sending her the monthly reports, she asked Dale Lyon for the reports and he declined.

Jules Huppert came knocking at her door in 1989 because he had just been indicted for subordination of perjury and needed money. He had been president of Valley State Bank and had en heavily involved in the conversion of cash into cashier's checks. She did not ask Huppert anything about the charges and made three loans to him that totalled about $36,000. She made a loan to Huppert also because he had used her consulting firm for several years when he was president of Valley State Bank.

p.734.... Mel asked Sam why Julie Coyne was in LCP. Sam said she was his mistress for several years and she brought in the banker, Jules Huppert; and Jules Huppert was used to wash the cash. Later in 1985, perhaps late summer, Sam told Mel that Julie was involved in money laundering.

There was a meeting at Sam Gilbert and Associates. Mel testified that all the defendants, including Sam, were there, plus Allsworth, Fainsbert and Kessler, Lyon, and Coyne, but Coyne was out in the secretarial area.

Fainsbert asked Mel Kessler and Michael Gilbert to step out of the office. Ben wanted Coyne to assign her interest. Ben was hollering at Sam, "You better get that _____ bitch to sign the

Section (f) of 18 U.S.C.1963 does not require that Julie Coyne be indicted and found guilty before she can be barred from purchasing the government's interest. The statute requires that she have "acted in concert with" defendants. That Julie Coyne did, over and over again, knowing of Ben Kramer's involvement.

It is appropriate under the statute for this court, which presided over the three months criminal trial and which was the trier of fact as well in the ancillary proceedings for another two-plus months, to determine if Julie Coyne is barred from being an eligible purchaser to claim and obtain the government's interests. From the findings set forth by this court in its lengthy opinion on the ancillary proceedings reported at 807 F.Supp. 707, portions of which are highlighted in footnote 4 of this order, this court readily and unequivocally concludes Julie Coyne "acted in concert with" the criminal defendants. She is therefore barred under the statute.[4]

 The statutory requirement that Julie Coyne have status as an "innocent person" provides an additional basis for disapproval of her acquisition of a greater interest in the Bicycle Club.[5] Her involvement in the organization from its inception has been inextricably intertwined with the illegal activity at the Bicycle Club.

Therefore, it is

**ORDERED AND ADJUDGED** as follows:

1. The United States is authorized to execute, deliver and perform the agreement of merger among Ladbroke Racing Corporation, Ladbroke 1 L.P. and LCP and related agreements ("agreement") in its capacities as General Partner and Limited Partner in LCP.

2. The agreement and merger when consummated shall vest clear title to all of the interests of the United States in the Bicycle Club in Pacific Racing Associates (Ladbroke).

3. All substantive objections, adverse claims, contentions or other matters presently raised by any person in opposition to the agreement are hereby denied and overruled.

---

papers. My money." Sam came out of his office beet-red in complexion with papers and accompanied by Fainsbert. Mel couldn't hear all of Sam's and Julie's words, but they were loud and Julie "spoke like Ben". *Kramer,* 807 F.Supp. at 712, 716–719, 734–735.

4. This court consequently has no reason to consider Julie Coyne's claim of first refusal under the partnership agreements of LCP.

5. 18 U.S.C. § 1963(f) provides "... the Attorney General shall direct the disposition of the property by sale or any other commercially feasible means, making due provision for the rights of any innocent persons." The court has found no case law interpreting this provision of the statute. However, "innocent" as used in 1963(f) does not necessarily equate to freedom from criminal indictment or conviction. Unambiguous statutory language should be given its plain meaning. *U.S. v. Valdes,* 876 F.2d 1554, 1557 (11th Cir. 1989). The term "innocent" is defined as "acting in good faith and without knowledge of incriminatory circumstances, or of defects or objections." Black's Law Dictionary (6th ed.1990). Furthermore, by way of analogy, 18 U.S.C. § 1963(1)(6)(B) requires third parties, in the context of ancillary proceedings, claiming an interest in the property to be "... reasonably without cause to believe that the property was subject to forfeiture...."